[No. B208573. Second Dist., Div. Five. Nov. 19, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CESAR JOE RIOS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

**COUNSEL**

Jeffrey Lewis, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Cesar Joe Rios, appeals from his carjacking conviction. (Pen. Code,[1] § 215, subd. (a).) The jury further found defendant personally used a handgun in the commission of the offense. (§ 12022.53, subd. (b).) Defendant was sentenced to the low term of three years for the carjacking plus 10 years for firearm use. Defendant was ordered to pay a $200 restitution fine (§ 1202.4, subd. (b)(1)); a $200 parole revocation restitution fine (§ 1202.45); and a $20 court security fee (§ 1465.8, subd. (a)(1)). Defendant received credit for 317 days in pretrial custody plus 48 days of conduct credit for a total presentence custody credit of 365 days.

In the published portion of this opinion, we discuss defendant's contention his custodial statement was admitted into evidence in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, 444–445, 473–474 [16 L.Ed.2d 694, 86 S.Ct. 1602]. Defendant contends his confession was inadmissible because the rule of implied waiver of constitutional rights first articulated by the United States

---

[1] All further statutory references are to the Penal Code except where otherwise noted.

Supreme Court in *North Carolina v. Butler* (1979) 441 U.S. 369, 371–379 [60 L.Ed.2d 286, 99 S.Ct. 1755], was abrogated by the decision in *Missouri v. Seibert* (2004) 542 U.S. 600, 616–617 [159 L.Ed.2d 643, 124 S.Ct. 2601] (plur. opn. of Souter, J.). We conclude the controlling constitutional rule in *Seibert* is that set forth in Associate Justice Anthony M. Kennedy's concurring opinion; Associate Justice Kennedy's opinion does not abrogate the implied waiver rule first articulated by the Supreme Court in *Butler*; and thus the implied waiver rule, which applies to this case, is not rescinded by *Seibert*.

## II. BACKGROUND

### A. The Prosecution Case

On July 29, 2007, after 6:00 p.m., Howard Stewart was sitting alone in his parked 1999 Firebird. He had just walked out of a Taco Bell restaurant and was eating his meal. After 10 or 15 minutes, Mr. Stewart saw a man walking towards the rear of the Firebird. Mr. Stewart put his hand on the ignition key, intending to drive away. The man was wearing a white T-shirt and baggy plaid pants. The man was holding a black revolver. The man pointed the gun at Mr. Stewart at waist level. The man said, " 'Get out of the car or I'll shoot you.' " Mr. Stewart's hand was still on the key. The man said, " 'Start it and I'll shoot you.' " Mr. Stewart opened the door and got out of the Firebird. The man with the gun got into the car. Someone else also got in on the passenger side. The second person appeared to Mr. Stewart to be a male. Mr. Stewart ran and the two men drove away. When sheriff's deputies arrived, Mr. Stewart described the man with the gun as Latino, early twenties, and wearing a white T-shirt with short plaid-type pants that went down below the knee a little bit. Mr. Stewart described the plaid pants as kind of baggy. Mr. Stewart described the second man as a Latino.

Deputy Sheriff Kurtis Ebbingia arrived at the carjacking scene on July 29, 2007, at approximately 7:15 p.m. It was still daylight. According to Deputy Ebbingia, Mr. Stewart was pretty excited and shaken up by the experience. Mr. Stewart described the two suspects as Latinos, approximately 18 to 20 years of age, five feet six or seven inches tall, and weighing 150 to 160 pounds. Mr. Stewart described the man who approached on the driver's side of the car with the gun as wearing a white T-shirt and plaid baggy shorts. Mr. Stewart described the gun as a .38- or .45-caliber revolver.

Deputy Sean Cariaga made a traffic stop of Mr. Stewart's stolen Firebird on July 30, 2007, at 2:00 or 3:00 p.m. Deputy Cariaga recognized the vehicle from a stolen car broadcast. There were two Latinos in the car—the driver

and a front seat passenger. Deputy Cariaga identified defendant as the driver and Jose Manuel Cuellar as the passenger. Both men were detained.

Defendant was advised of his constitutional rights to silence and counsel. Defendant claimed he got the car from one of his "homies" the night before. Defendant said he picked it up in East Los Angeles. Deputy Cariaga testified to what happened next, "I told him that we had a victim that we had on the way who was going to come and identify him." Defendant looked like he was afraid. He put his head down and started to shake it. Deputy Cariaga asked, "[W]ould you really have shot the guy if he wouldn't have given the car up?" Defendant said no. Defendant was asked what he had been doing before he took the car. Defendant said he had been walking home from the mall. Defendant was accompanied by Mr. Cuellar. Defendant said he had a gun while he was at the mall, a .38-caliber handgun. He had given it to one of his homies. The car was searched, but the gun was not found.

Deputy Cariaga also spoke with Mr. Cuellar. Mr. Cuellar was advised of his constitutional rights. Mr. Cuellar admitted defendant had gotten the car the night before. Mr. Cuellar admitted he " 'probably' " knew the car was stolen. Deputy Cariaga also described the conversation with Mr. Cuellar, "I told him that his brother had admitted to taking the car and he told me that he was there with his brother when his brother took the car at gunpoint." Deputy Cariaga described the remainder of Mr. Cuellar's statement: "He said he didn't do anything. He was just there. However, he said that he told the victim not to do anything stupid."

Both defendant and Mr. Cuellar gave written, signed and fingerprinted statements. Deputy Cariaga gave Mr. Cuellar a piece of paper. Mr. Cuellar was instructed to write down what happened. Mr. Cuellar wrote on July 30, 2007: " 'Me and my brother—he told me that he,' wan[t]s a car . . . [¶] . . . 'so we see a old m[a]n' . . . [¶] . . . 'and we w[e]nt to the car and he point the gun at h[i]m' . . . [¶] . . . 'so we too[k] . . . the car and I told the man to do' [nothing stupid]."

Mr. Stewart, the victim, got his car back. There was clothing in the car that did not belong to him, including a pair of plaid shorts. The plaid shorts were like the ones the man with the gun had been wearing. Mr. Stewart told Detective Brendan Caslin about the shorts. Mr. Stewart was unable to identify anyone from photographic line ups. Nor was he able to identify anyone in court. The photographic lineups shown to Mr. Stewart included one photograph of defendant and one of his codefendant, Mr. Cuellar.

### B. The Defense Case

Mr. Cuellar testified he was 16 years old in July 2007. Mr. Cuellar knew defendant from a foster home, but they were not related; they were friends. Mr. Cuellar referred to defendant as a brother to others. On July 29, 2007, they had both gotten out of what Mr. Cuellar referred to as a jail and met again in the same foster home. They rode the bus to the West Covina Mall. When they were walking home from the mall, defendant, who was wearing plaid shorts and a white T-shirt, walked up to the driver's side of a car and pointed a gun at Mr. Stewart. Mr. Stewart was ordered to get out of the car. Defendant pulled the black gun from his waist. Mr. Cuellar was by the side of the car. Mr. Cuellar saw that Mr. Stewart was trying to turn on the ignition. Defendant said, " 'Don't do nothing stupid.' " Mr. Cuellar spoke to Mr. Stewart. Mr. Cuellar testified as to why he said anything at all: "Because he was in a bad situation, because I knew my brother." Mr. Cuellar thought defendant was going to do something bad. Mr. Cuellar wanted to protect the driver, Mr. Stewart. Defendant told Mr. Stewart to get out of the car. Defendant also said, " 'If you turn that on I'm going to shoot you.' " Mr. Stewart got out of the car and defendant told Mr. Cuellar to get in. Mr. Cuellar did not know that defendant was going to pull a gun and take the car. But Mr. Cuellar did know defendant had a fake revolver that looked like a .38-caliber handgun. Mr. Cuellar admitted initially lying to Deputy Cariaga about not knowing anything about the carjacking.

When cross-examined, Mr. Cuellar was asked why he was testifying. The following transpired: "Q Isn't it true that you're on the stand today to put all the responsibility on him because he's your older brother and he's willing to take the responsibility? [¶] A Yes. [¶] Q Isn't it true that what's going on is you know because he's willing to take the responsibility, you're trying to lighten the load by testifying now for the first time telling us that is not a real gun, but a fake gun; isn't that correct. [¶] A Yes." Mr. Cuellar testified defendant was willing to take responsibility for the carjacking. Mr. Cuellar had asked defendant, "[W]hat do we do[?]" And defendant responded, " 'Do what you got to do,' " which Mr. Cuellar interpreted to mean to tell the truth. Mr. Cuellar warned Mr. Stewart not to do anything stupid. During the carjacking, Mr. Cuellar was afraid defendant would hit Mr. Stewart with the fake gun. After the carjacking, when Mr. Cuellar was dropped off at his girlfriend's house, the gun was still in the car under the driver's seat.

### C. The Verdicts and Judgments

As noted above, the jury found defendant guilty of carjacking and of personal firearm use. The jury also found Mr. Cuellar guilty of carjacking. Defendant was sentenced to 13 years in state prison. Mr. Cuellar was sentenced to three years in state prison.

## III. DISCUSSION

### A. *Miranda* Rights Waiver

#### 1. Testimony and ruling

Prior to trial, defendant moved to suppress the incriminating statements he made following his arrest. Deputy Cariaga arrested defendant. Deputy Cariaga then secured a statement from defendant. This occurred while defendant was seated in the back of a patrol car. Deputy Cariaga described how the advisement of rights occurred: "After we detained him, he was seated in the back seat of the [sheriff's] car. I advised him of his rights and asked if he understood his rights. He said yes, and then I left the police car for a period of about five to ten minutes." Defendant, who was not under the influence of drugs or alcohol, did not ask any questions. As a matter of interrogation technique, Deputy Cariaga did not ask defendant for an express waiver. Rather, after reading the advisement of *Miranda* rights, Deputy Cariaga left the sheriff's car for five to 10 minutes. Upon returning to the patrol car, Deputy Cariaga then questioned defendant. Deputy Cariaga did not know defendant's age. The trial court found defendant had been properly advised of and waived his *Miranda* rights and denied the motion to exclude his statements.

#### 2. Defendant's contention

Defendant contends it was reversible error to admit the statements he made while seated in the backseat of the patrol car. Defendant argues the prosecution failed to demonstrate he validly waived his rights to silence and counsel. Defendant reasons as follows. Deputy Cariaga did not know defendant's age. Defendant was not asked if he wanted to answer any questions. He was only asked if he understood his constitutional rights. After indicating he understood his rights to silence and counsel, defendant was left alone in the back of the patrol car for five to 10 minutes. Defendant was then questioned without revisiting the subject of *Miranda* or inquiring about his willingness to speak. Defendant argues Deputy Cariaga's interrogation technique of not soliciting a waiver of the rights was similar to the tactics disallowed by Justice Souter's plurality opinion in *Missouri v. Seibert, supra,* 542 U.S. at pages 616–617. Defendant contends Deputy Cariaga's interrogation technique was intended to undermine the *Miranda* decision and to obtain a confession that might not otherwise have been forthcoming. This, defendant asserts, is akin to the investigative technique disapproved of by the plurality in *Missouri v. Seibert, supra,* 542 U.S. at pages 616–617. Hence, defendant argues his statements made while seated in the patrol car were inadmissible.

### 3. The trial court could find defendant validly waived his rights to counsel and silence.

■ Our Supreme Court has held, "Under the familiar requirements of *Miranda*, . . . a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent. [Citations.]" (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992], overruled on other grounds in *People v. Storm* (2002) 28 Cal.4th 1007, 1031–1032 [124 Cal.Rptr.2d 110, 52 P.3d 52], citing *Miranda v. Arizona, supra*, 384 U.S. at pp. 444–445, 473–474.) Our Supreme Court has also held, "Statements elicited in violation of this rule are generally inadmissible in a criminal trial. [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 732 [60 Cal.Rptr.2d 1, 928 P.2d 485], citing *Miranda v. Arizona, supra*, 384 U.S. at pp. 492, 494; see also *People v. Neal* (2003) 31 Cal.4th 63, 67 [1 Cal.Rptr.3d 650, 72 P.3d 280].) The admissibility of an in custody accused's statement despite the fact no explicit waiver was secured was first discussed by the United States Supreme Court in *North Carolina v. Butler, supra*, 441 U.S. at pages 371–379. Our Supreme Court first addressed the issue in *People v. Johnson* (1969) 70 Cal.2d 541, 557–558 [75 Cal.Rptr. 401, 450 P.2d 865], disapproved on another point in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, footnote 8 [135 Cal.Rptr. 786, 558 P.2d 872]. It is well established there is no requirement that an in custody accused expressly waive the right to counsel and silence after being advised of those rights. (*North Carolina v. Butler, supra*, 441 U.S. at p. 373, fn. 4 ["a court *may* find an intelligent and understanding rejection of counsel in situations where the defendant did not *expressly* state as much"]; *People v. Medina* (1995) 11 Cal.4th 694, 752 [47 Cal.Rptr.2d 165, 906 P.2d 2] ["An express statement of waiver is not required . . . ."]; *People v. Davis* (1981) 29 Cal.3d 814, 824 [176 Cal.Rptr. 521, 633 P.2d 186] ["The absence of an express waiver does not in itself establish that the right has been invoked."]; *People v. Johnson, supra*, 70 Cal.2d at pp. 557–558 [" '[W]e cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently, and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.' "].)

The core issue in ruling on a challenge to a *Miranda* waiver is whether an in custody accused made an uncoerced and fully aware choice not to assert the right to counsel or silence. Our Supreme Court has explained: " '[I]f the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension . . . a court [may]

properly conclude that the *Miranda* rights have been waived. [Citations.] [¶] . . . [¶] . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.' [Citation.]" (*People v. Whitson* (1998) 17 Cal.4th 229, 247 [70 Cal.Rptr.2d 321, 949 P.2d 18], quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421, 422–423 [89 L.Ed.2d 410, 106 S.Ct. 1135].)

■ Our Supreme Court has held: "To determine whether a minor's confession is voluntary, a court must look at the totality of circumstances, including the minor's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the given statement. [Citations.] 'The decision to confess cannot be of itself an indicium of involuntariness in the complete absence of coercive circumstances.' [Citation.] A court should look at whether the minor 'was exposed to any form of coercion, threats, or promises of any kind, trickery or intimidation, or that he was questioned or prompted by . . . anyone else to change his mind.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 383 [110 Cal.Rptr.2d 272, 28 P.3d 34]; see also *Fare v. Michael C.* (1979) 442 U.S. 707, 724–725; *People v. Hector* (2000) 83 Cal.App.4th 228, 234–235 [99 Cal.Rptr.2d 469].)

In reviewing alleged *Miranda* violations, we must accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported. In addition, we must independently determine from undisputed facts and those found by the trial court whether the challenged statement was legally obtained. (*People v. Storm, supra*, 28 Cal.4th at pp. 1022–1023; *People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Lewis, supra*, 26 Cal.4th at p. 383; *People v. Whitson, supra*, 17 Cal.4th at p. 248; *People v. Mayfield, supra*, 14 Cal.4th at p. 733; cf. *In re Anthony J.* (1980) 107 Cal.App.3d 962, 971 [166 Cal.Rptr. 238] [burden to establish whether accused's statements are voluntary is greater if the accused is a juvenile rather than an adult].)

As noted, relying on *Missouri v. Seibert, supra*, 542 U.S. at pages 616–617, defendant contends Deputy Cariaga's interrogation technique was intended to undermine the *Miranda* decision and secure a confession that otherwise might not have been obtained. In *Seibert*, five justices, in three opinions, held *Miranda* warnings given *midinterrogation*, after a confession had already been obtained, were ineffective. Justice Souter's plurality opinion described "a police strategy adapted to undermine the *Miranda* warnings": "The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after

a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything [the suspect] said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the officer] set the scene by saying[,] 'we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?' . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." (*Id.* at pp. 616–617, citation & fns. omitted.)

As noted, defendant argues that Deputy Cariaga's interrogation technique relying on an implied waiver of rights was similar to the tactics disallowed in Justice Souter's plurality opinion in *Missouri v. Seibert, supra,* 542 U.S. at page 604. To begin with, we respectfully disagree with defendant's characterization of the *controlling* rule in *Seibert.* Now Retired Justice Souter's plurality opinion was joined in by Associate Justices John Paul Stevens, Ruth Bader Ginsburg, and Stephen Breyer. Hence, Justice Souter's opinion did not have the concurrence of five justices. Although signing Justice Souter's opinion, Justice Breyer filed a concurring opinion. In his concurring opinion, Justice Breyer advocated following a simple rule in the case of the "two-stage interrogation technique" present in *Seibert*: "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith. [Citations.]" (*Missouri v. Seibert, supra,* 542 U.S. at p. 617 (conc. opn. of Breyer, J.).) Justice Breyer noted the "fruits" test, which was practicable and workable in the Fourth Amendment context, should be applied as follows: "The truly 'effective' *Miranda* warnings on which the plurality insists . . . will occur only when certain circumstances—a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning—intervene between the unwarned questioning and any post-warning statement. [Citation.]" (*Id.* at p. 618 (conc. op. of Breyer, J.), citation omitted.) And Justice Breyer also agreed with Justice Kennedy's concurring opinion, stating: "I consequently join the plurality's opinion in

full. I also agree with Justice Kennedy's opinion insofar as it is consistent with this approach and makes clear that a good-faith exception applies." (*Ibid.* (conc. opn. of Breyer, J.).)

Justice Kennedy agreed with the four justice plurality that the defendant's statement was inadmissible: "The interrogation technique used in this case is designed to circumvent *Miranda v. Arizona* . . . . It undermines the *Miranda* warning and obscures its meaning. The plurality opinion is correct to conclude that statements obtained through the use of this technique are inadmissible." (*Missouri v. Seibert, supra*, 542 U.S. at p. 618 (conc. opn. of Kennedy, J.).) Although he agreed with much of the plurality analysis, which he considered convincing, Justice Kennedy's approach differed in material respects which he discussed in some detail. Initially, Justice Kennedy noted that the *Miranda* rule, "an important and accepted element of the criminal justice system" (*ibid.*), was subject to practical exceptions such as: unwarned statements may be used for impeachment purposes (*Harris v. New York* (1971) 401 U.S. 222, 225–226 [28 L.Ed.2d 1, 91 S.Ct. 643]); countervailing public safety concerns may warrant the use of an accused's statement secured without proper warnings (*New York v. Quarles* (1984) 467 U.S. 649, 659–660 [81 L.Ed.2d 550, 104 S.Ct. 2626]); and physical evidence is admissible even though secured from statements made in violation of the *Miranda* rule as discussed in *United States v. Patane* (2004) 542 U.S. 630, 639 [159 L.Ed.2d 667, 124 S.Ct. 2620] (plur. opn. of Thomas, J.). (*Missouri v. Seibert, supra*, 542 U.S. at pp. 618–619 (conc. opn. of Kennedy, J.).) In Justice Kennedy's view, the scope of the suppression remedy depends on a consideration of the legitimate interests such as those discussed in the immediately preceding sentence and whether admission of the accused's statements would frustrate the central objectives of the *Miranda* decision. (*Id.* at p. 619 (conc. opn. of Kennedy, J.).)

Justice Kennedy gave as an example of this practical accommodation the holding in *Oregon v. Elstad* (1985) 470 U.S. 298, 308–309 [84 L.Ed.2d 222, 105 S.Ct. 1285]. In *Elstad*, the defendant: was arrested in his home pursuant to a warrant and was briefly questioned there before being taken to the sheriff's station; after arriving at the sheriff's station, he was advised of and waived his rights; and proceeded there to make an incriminating statement. The Supreme Court held that the first statement made at the defendant's home was inadmissible but the second one made after the advisement of *Miranda* warnings was admissible. The result in *Elstad*, from Justice Kennedy's perspective, showed a deference to the practical concerns involved in the enforcement of the *Miranda* rule: "*Elstad* reflects a balance and pragmatic approach to enforcement of the *Miranda* warning. An officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time. Skilled investigators often interview suspects multiple

times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection. In light of these realities it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning. [Citation.]" (*Missouri v. Seibert, supra*, 542 U.S. at p. 620 (conc. opn. of Kennedy, J.).) The Supreme Court in *Elstad* held that to suppress the second statement, which followed a *Miranda* advisement, because of the failure to have administered warnings prior to the initial questioning, did not serve the goals of deterring improper police conduct nor assuring the trustworthiness of evidence. (*Id.* at p. 620, citing *Oregon v. Elstad, supra*, 470 U.S. at p. 308.)

Justice Kennedy believed the facts in *Seibert* presented considerations different from those in *Elstad*: the two-step questioning process involved a deliberate *Miranda* violation; in essence, the two-step process constituted an intentional misrepresentation and distortion of the scope of *Miranda* rights available to the accused; and the two-step process furthered no legitimate objectives that might otherwise justify its use by law enforcement. (*Missouri v. Seibert, supra*, 542 U.S. at pp. 620–621.) Further, Justice Kennedy noted the deliberate use of the prewarning statements on the defendant later after the *Miranda* warning was given. (*Id.* at p. 621.)

Much of this latter portion of Justice Kennedy's analysis dovetailed with the analysis in Justice Souter's plurality opinion. But Justice Kennedy disagreed with the scope of the rule posited in Justice Souter's plurality opinion. Justice Souter's plurality opinion identifies the following as the relevant inquiry: "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." (*Missouri v. Seibert, supra*, 542 U.S. at pp. 611–612, fn. omitted.)

Justice Kennedy synthesized the plurality test thusly, "The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on 'whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object' given the specific facts of the case." (*Missouri v. Seibert, supra*,

542 U.S. at p. 621 (conc. opn. of Kennedy, J.).) Justice Kennedy disagreed with the plurality test because it was too broad in his view. (*Id.* at p. 622.) Rather, Justice Kennedy articulated the following test: "The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. [Citations.] Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand." (*Ibid.* (conc. opn. of Kennedy, J.).)

█ As can be noted, the rule in Justice Souter's plurality opinion differs from that in Justice Kennedy's concurring opinion. When a fragmented Supreme Court issues an opinion which does not have the assent of five justices, generally, the controlling holding is that of those who concurred in the judgment on the narrowest grounds. (*Panetti v. Quarterman* (2007) 551 U.S. 930, 949 [168 L.Ed.2d 662, 127 S.Ct. 2842] ["When there is no majority opinion, the narrower holding controls."]; *Romano v. Oklahoma* (1994) 512 U.S. 1, 9 [129 L.Ed.2d 1, 114 S.Ct. 2004] ["As JUSTICE O'CONNOR supplied the fifth vote in *Caldwell*[ *v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]] and concurred on grounds narrower than those put forth by the plurality, her position is controlling."]; *Marks v. United States* (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990] ["When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' "].)

█ In *U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157–1158, Judge Raymond C. Fisher, in the context of the *Seibert* opinion, analyzed the special rule for applying a Supreme Court decision where five justices are not in accord as to the correct rule of constitutional law. Judge Fisher explained the Ninth Circuit approach to discerning the controlling rule in *Seibert*: "Applying the *Marks* rule to *Seibert*, we hold that a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and

circumstances—did not effectively apprise the suspect of his rights. Although the plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections. *See* [*U.S. v.*] *Rodriguez-Preciado*[ (9th Cir. 2005)] 399 F.3d [1118,] 1139 (Berzon, J., dissenting) ('Justice Kennedy concurred in *Seibert* on a ground arguably narrower than that relied upon by the plurality.'); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006) (stating that the Third Circuit 'applies the *Seibert* plurality opinion as narrowed by Justice Kennedy'); *United States v. Briones*, 390 F.3d 610, 613–14 (8th Cir. 2004) (explaining that the 'first step' in Justice Kennedy's 'narrower test' is 'to determine whether a [two-step] interrogation process was used as a deliberate strategy'); [*U.S. v.* ]*Stewart*[ (7th Cir. 2004)] 388 F.3d [1079,] 1090 ('Justice Kennedy thus provided a fifth vote to depart from *Elstad*, but only where the police set out deliberately to withhold *Miranda* warnings until after a confession has been secured.'). In other words, both the plurality and Justice Kennedy agree that where law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession. This narrower test—that excludes confessions made after a deliberate, objectively ineffective mid-stream warning— represents *Seibert's* holding." (*U.S. v. Williams, supra*, 435 F.3d at pp. 1157–1158, original italics, fn. omitted; accord, *U.S. v. Narvaez-Gomez* (9th Cir. 2007) 489 F.3d 970, 974 ["Justice Kennedy's concurrence in *Seibert* is the Court's holding because it is narrowest grounds with which majority of the Court would agree."].) We agree with Judge Fisher's cogent analysis.

We turn now to defendant's contention that *Seibert* requires defendant's statements made in the backseat of the patrol car to be suppressed. At the outset, we decline to apply the rule in Justice Souter's plurality opinion. Rather, the controlling rule is that set forth in Justice Kennedy's concurring opinion. Nothing in Justice Kennedy's concurring opinion, the applicable constitutional rule, disapproves or even discusses the holding in *North Carolina v. Butler, supra*, 441 U.S. at page 373, footnote 4, and its progeny (see *ante*, at p. 500) which permit a trial court to find implied waiver of constitutional rights.

 Further, the United States Supreme Court has repeatedly explained that if a suspect makes a noncoerced decision to speak with the authorities with knowledge of the rights to remain mute and to counsel, the ensuing statement is admissible as a matter of law. (*Moran v. Burbine, supra*, 475 U.S. at pp. 422–423 ["Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his

statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."]; see *Montejo v. Louisiana* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 955, 129 S.Ct. 2079, 2085] ["[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . . ."]; *People v. Whitson, supra,* 17 Cal.4th at p. 247.) Here, Deputy Cariaga's advisement coupled with defendant's implied waiver fulfilled all the requirements imposed by *Miranda.* Nothing in Justice Kennedy's concurring opinion in *Seibert* discussed or disapproved of the foregoing bright line rule discussed in *Moran.*

Our refusal to read a new unspoken constitutional rule concerning intentional efforts to secure an implied waiver into the *Seibert* decision is consistent with other Court of Appeal decisions involving related *Miranda* issues. For example, in *People v. Riskin* (2006) 143 Cal.App.4th 234, 242–243 [49 Cal.Rptr.3d 287], the defendant argued that if the police deliberately secure a non-Mirandized statement, the rule first articulated in *Harris v. New York, supra,* 401 U.S. at pages 225–226, allowing for impeachment with unwarned admissions, was abrogated by *Seibert.* Our colleagues in the Fifth Appellate District concluded that nothing in *Seibert* abrogated the *Harris* impeachment rule: "[T]he [plurality] opinion cites *Harris* only once in a footnote, Justices Kennedy and O'Connor cite *Harris* but once each in their concurring and dissenting opinions, . . . and none of those three references criticizes the case. [Citation.] The notion that the high court so inscrutably overruled a landmark case in *Miranda*'s lineage is absurd." (*People v. Riskin,* at p. 243.)

In similar vein, in the case of *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 58, 63–66 [34 Cal.Rptr.3d 430], the juvenile court sustained a delinquency petition. Thereafter, the *Seibert* opinion was filed. The minor filed a new trial motion which the juvenile court granted. The basis of the new trial motion was that the minor's confession should have been suppressed based upon the *Seibert* decision. (*Id.* at p. 58.) The evidence before the juvenile court indicated a detective spoke to the minor's foster mother. The foster mother was asked to bring the minor to a police station. Pursuant to that request, the minor's foster mother brought him to the police station. The minor was brought to a secure area and was questioned by a detective. The minor was thanked for voluntarily coming to the station; told he was not under arrest and was free to leave at any time he wished; but not advised of his constitutional rights. After 25 minutes of questioning, the minor was asked about the robbery of a pizza delivery person. The minor lied at first and claimed he was not involved. Later, the minor changed his story and admitted participating in the robbery. At no time during the questioning did the minor ask to leave. At the conclusion of the questioning, the minor was detained and then advised of his constitutional rights. (*Id.* at pp. 59–60.)

The Court of Appeal reversed the order granting the new trial motion. The Court of Appeal first noted, while discussing the merits of the admissibility of the confession issue, that the minor, who had been told he was free to leave the station, unquestionably was not in custody for *Miranda* purposes when he was questioned. (*In re Kenneth S., supra,* 133 Cal.App.4th at pp. 64–65; see *Stansbury v. California* (1994) 511 U.S. 318, 320–325 [128 L.Ed.2d 293, 114 S.Ct. 1526]; *Michigan v. Chesternut* (1988) 486 U.S. 567, 575, fn. 7 [100 L.Ed.2d 565, 108 S.Ct. 1975]; *California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 103 S.Ct. 3517]; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 97 S.Ct. 711].) The Court of Appeal next discussed the juvenile court's reliance on the *Seibert* opinion as authority for the proposition the minor was in custody for *Miranda* purposes. (*In re Kenneth S., supra,* 133 Cal.App.4th at pp. 65–66.) The Court of Appeal explained that the *Seibert* opinion did not address nor was it authority on the custody issue: "Moreover, in *Seibert,* when the suspect was interrogated, she was already under arrest and in custody. The *Seibert* court was not required to decide the issue before us, whether the suspect was in custody. That case therefore provides no guidance on that point." (*Id.* at p. 66.)

 Nothing in Justice Souter's plurality nor Justices Breyer's and Kennedy's concurring opinions abrogates the rule articulated in *North Carolina v. Butler, supra,* 441 U.S. at page 373, footnote 4, which allows for a trial court to find an in custody accused has impliedly waived her or his *Miranda* rights. Further, other than in the narrow context of the use of the two-step procedure, nothing in Justice Souter's plurality nor Justice Breyer's and Kennedy's concurring opinions abrogate the rule articulated in *Moran v. Burbine, supra,* 475 U.S. at pages 422–423, to the effect that if the accused is advised of and waives his or her *Miranda* rights, an ensuing voluntary statement is admissible as a matter of law as part of the prosecutor's case-in-chief. The outcome of the *Miranda* issue before us is not controlled by *Seibert.*

 In this case, the trial court looked to the totality of the circumstances surrounding defendant's interrogation and concluded that he voluntarily waived his rights. Defendant was advised of his *Miranda* rights and asked if he understood those rights. Defendant answered in the affirmative. Defendant did not ask Deputy Cariaga any questions. Defendant was not under the influence of drugs or alcohol. Five to ten minutes later, when questioned, defendant readily answered. Nothing suggested that defendant was incapable of understanding the warnings given by Deputy Cariaga. There is no indication defendant was coerced or that he invoked his *Miranda* rights. Substantial evidence supports the trial court's finding that defendant's admissions were admissible.

## B. Presentence Custody Credit*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is modified to reflect 364 days of presentence credits, which includes 47 days of conduct credit. The superior court clerk is to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Kriegler, J., concurred.

**MOSK, J.,** Concurring.—I concur that under the circumstances of this case there was sufficient evidence to justify the conclusion that defendant voluntarily waived his rights before making statements. Therefore his admissions were admissible.

Appellant's petition for review by the Supreme Court was denied February 24, 2010, S179080. Baxter, J., did not participate therein.

---

*See footnote, *ante,* page 491.