Filed 8/27/14  P. v. Martin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048437 |
| v. | (Super. Ct. No. 11CF1354) |
| JEREMY DWAYNE MARTIN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

Jeremy Dwayne Martin appeals from a judgment after a jury convicted him of first degree murder (Pen. Code, § 187, subd. (a)).[1]  The jury found true the allegation Martin personally discharged a firearm in the commission of the offense, causing death (§ 12022.53, subd. (d)).  The court denied probation and imposed two consecutive life terms, each with a minimum of 25 years prior to parole eligibility.

Martin's sole contention on appeal is the trial court erred by allowing the prosecution to admit incriminating statements he made to police officers were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He alleges police officers used a two-step process in violation of *Missouri v. Siebert* (2004) 542 U.S. 600 (*Siebert*).  He asserts his conviction must be reversed because of this error.  Finding no error, we affirm the judgment.

                                                         FACTS

Frederick Martin (Fred) lived in a mobile home park located in Huntington Beach.  In the early morning hours of May 20, 2011, multiple neighbors heard Fred and his son, Martin, arguing and saw them engaging in a physical altercation.  One of the neighbors observed Martin holding onto Fred and grabbing Fred's wrist.  It appeared Fred was trying to hold onto a gun and Martin was trying to control Fred's hands.  Fred repeatedly told Martin to "stop it."  The men spun around a few times before the gun was kicked out into the street.  Martin walked out into the street and picked up the gun.  Martin was heard to yell, "You son of a bitch.  You tried to have me murdered last night."  A second neighbor heard gunfire coming from the area of Fred's carport.  When she looked out at Fred's carport area, she observed Fred was bleeding from the head as he hosed down the carport area.

At approximately 7 a.m., Fred left a voicemail for a coworker at Kaiser Permanente.  During that message, Fred was heard saying, "Jeremy, put the gun

---

[1]            All further statutory references are to the Penal Code.

2

away. We're just gonna [*sic*] talk that's all. Put it away and we'll just talk." At about the same time, Huntington Beach Police Officers Timothy Emanuel and Jason Burton responded to a call from the mobile home park relating to an argument over mental health problems. The reporting party believed a person was showing paranoid tendencies and needed to be evaluated. Huntington Beach Police Officer DeLiema[2] arrived at the scene before Emanuel and Burton.

Emanuel met Fred at the clubhouse within the mobile home park. He observed Fred had two fresh lacerations on his forehead that were oozing blood. Emanuel did not see any other injuries, but it appeared to Emanuel that Fred had just been in a fight. Fred seemed to be out of breath and had difficulty finishing his sentences. Fred was not frantic. He spoke in a calm tone of voice and seemed to be concerned about his son.

Emanuel asked Fred how he had been injured, and Fred responded he had slipped on wet concrete and struck his head. The officers repeatedly asked Fred whether he wanted medical attention. Each time Fred responded he was going to go to Kaiser for treatment on his own. Although Fred told the officers not to call the paramedics, they called for paramedics at 7:33 a.m. anyway. After the paramedics finished with Fred, the officers accompanied Fred back to his mobile home.

Emanuel pressed Fred about how he was injured. He changed his story slightly. Fred seemed very alarmed and concerned for the safety of his son, Martin. He told Emanuel he was concerned about his son because his son had been acting strangely and had been up all night. Fred was concerned Martin was mentally unstable. He told Emanuel that Martin had a gun he typically kept in the mobile home with him. Fred wanted the officers to help him get the gun away from Martin. Fred denied having

---

[2]    Officer DeLiema's first name does not appear in the record.

been in a physical altercation with Martin and did not indicate Martin had ever threatened him with the gun.

After the paramedics left, Emanuel, Burton, and DeLiema went with Fred back to the mobile home to see if they could make contact with Martin. After a few minutes passed, Fred told the officers either Martin was not answering the door or he had left. The officers advised Fred to call immediately if he needed assistance. They also told him about mental health associations and clinics where he could get help for his son. When the officers left at 8:00 a.m., Fred was standing near his pickup truck. He told the officers he was on his way to Kaiser to obtain treatment for his injuries.

At 8:30 a.m. that morning, Martin called the Huntington Beach Police Department and reported he had an emergency. Martin either said "'my father was coming at me,'" or "'he was charging at me.'" The 911 operator indicated Martin spoke slowly and his voice was calm but occasionally quivering. The operator transferred the call to the dispatcher. Martin told the dispatcher he had an emergency and gave the address of the mobile home he shared with his father. The dispatcher asked if Martin had called earlier about his son. Martin told the dispatcher the previous call had been from his father. When asked what was going on now, Martin responded Fred had "started like really like choking me and I felt like I was about to die." Martin told the dispatcher, "I had to do it to save my own life." He said his father was "in the kitchen . . . with a small bullet wound," and admitted he had shot his father. Martin said he shot his father in self-defense because his father was trying to kill him. When asked where the gun was, Martin said the gun was in his room.

The police arrived at the scene and the dispatcher told Martin to put the cell phone down and go outside without anything in his hands. Martin complied.

Officers Emanuel, Burton, DeLiema, and Officer Joel Peterson, were dispatched to the mobile home park in response to Martin's call. When Emanuel and Burton arrived Peterson and DeLiema were already there, and Martin was outside the

4

mobile home.  Emanuel handcuffed Martin without incident.  Martin had "a light redness around the outside of his neck," but Emanuel did not observe any other injuries.

After Martin was detained, Peterson asked Martin a few questions.  Peterson asked Martin where his father was and where the father had been shot.  Martin responded his father was in the kitchen and had been shot in the face.  Peterson asked whether Martin's father was alive.  Martin responded he was not; he was dead.  When Peterson, DeLeima, and Burton entered the residence, Peterson observed Fred's body lying face down in a pool of blood.  Brain matter appeared to be protruding from his head.  There were no signs of life.

While other officers were checking the mobile home, Emanuel walked Martin back to the patrol car.  At this point, Emanuel was unaware of Fred's condition.  Emanuel told Martin that he was going to have to remain in handcuffs while officers checked the mobile home.  Martin said that was fine because he "didn't have anything to worry about, he had just defended himself."  Emanuel then asked Martin what had happened (the first interview).  Martin told Emanuel that he had been in an altercation with his father in the morning.  His father tried to choke him so he defended himself with a gun.  In addition to the circumstances surrounding the shooting, Emanuel asked Martin if he had been using drugs, specifically methamphetamines.  Because Martin's speech was very rapid and he was licking his lips, Emanuel thought Martin might be under the influence of drugs.  Martin denied being under the influence.  After Martin had made these statements, Emanuel read Martin the *Miranda* rights off of a card, and Martin told Emanuel he understood his rights.  Emanuel did not ask any more questions.

Before Martin was transported to the Huntington Beach Police station, Detective Patrick Ellis spoke briefly with Martin.  Ellis had received a quick summary of the situation from Emanuel.  Ellis asked Martin where the gun was located.  Martin told Ellis that he was not sure where the gun was but speculated it was on top of a speaker in

5

his bedroom. Ellis thanked Martin for his cooperation and told Emanuel to take Martin to the station so he could be interviewed in the proper setting.

Ellis next saw Martin at the Huntington Beach Police station about an hour later (the second interview). At Ellis's direction, Martin was checked for gunshot residue, and blood was drawn. Before questioning Martin, Ellis confirmed an officer had read Martin his *Miranda* rights, and Ellis asked Martin if he remembered that. Martin indicated he remembered. Ellis then said he was going to read them again, "just for drill." As Ellis read each *Miranda* right, he asked Martin if he understood the right. Martin confirmed he understood each right. Ellis believed Martin understood his rights and was willing to talk about the crime. Detective Jeff McMillan was sitting in on this interview.

Martin told the detectives there was tension between him and his dad at times. His dad had been supporting him, and his dad had been threatening to kick him out of the house. Martin said he and Fred were arguing in the kitchen the morning of the shooting. Fred was heckling him, and it became "kind of intense." Martin walked back to his room, got the gun, and walked back into the kitchen. Martin said he was not sure what time the argument had started, but the sun already was up. He said it was very traumatizing.

Martin described his gun, the ammunition, and his familiarity with the operation of the gun in detail. He explained he had a lock for the gun and he kept the gun in a safe in his bathroom. He admitted he and his father were arguing the morning of the killing. Martin said after arguing with Fred, he went to his bathroom and retrieved the gun safe. He used his key to open the gun safe on the floor in his bedroom. Martin said he shot Fred in the face after Fred came toward him "in like a[n] aggressive manner." Martin admitted his father was not armed with any weapon. But he claimed the situation "was definitely to where I felt like my safety was . . . my safety was in jeopardy . . . ." Martin repeatedly insisted he felt his life was in danger. He believed Fred was going to

6

kill him. He maintained walking away was not an option. Nor could he have called the police.

Martin said he shot Fred in the face because Fred was going to send him to prison. He believed Fred was going to frame him for "cooking meth." Fred was going to ruin his life by "putting [him] in prison for something [he] didn't do." When one of the detectives told Martin that Fred was threatening his freedom, but not his life, Martin responded, "Well, it's, to me, going to prison is your life." When asked why he shot his father, Martin said "because he was, he was basically sending me to prison."

Martin denied using drugs during the 24 hours preceding the interview and claimed he did not have a history of drug use. He admitted he had tried marijuana a couple of times but denied he ever tried methamphetamine or heroin.

The following day Ellis and Detective Michael Reilly interviewed Martin again at the Huntington Beach Police station (the third interview). Ellis asked Martin if he remembered his *Miranda* rights, and Martin again responded in the affirmative. Ellis advised Martin his "*Miranda* rights are still in effect." He then asked Martin if he needed his rights read again, and Martin indicated he did not. When he conducted this interview, Ellis knew where the gun had been discovered and about the safe and its contents. Martin had a cast or splint on his arm, apparently because his arm was broken or injured during his fight with Fred. He told the detectives he was in pain.

Ellis told Martin they found his gun under his bed. Martin told the detectives he had the gun because he felt he needed protection. He had the gun in his pocket, and Fred grabbed it right before the fight. Fred asked Martin to put the gun away, but Martin said he "didn't think that was the best." There was a struggle over the gun, and when Martin got it, he threw it as far away as possible. After Martin retrieved the gun, he went back to his room. Martin explained he came back out of his room with the gun because he was being asked to leave without being able to pack or take his car.

7

Martin said when he returned to the kitchen with the gun, he believed his judgment was not the best. He was being kicked out of his own home. He admitted he racked the gun in his bedroom before he returned to the kitchen and checked to make sure there was a round in the chamber. Martin admitted the methamphetamine found in the safe belonged to him, and opined the incident was the result of his use of methamphetamine. Martin said he had been awake for four or five days before the shooting.

Martin filed a motion to exclude his postarrest statements arguing the officers abridged his rights under *Miranda*. He specifically alleged police officers used a two-step process in violation of *Seibert, supra,* 542 U.S. 600. After a pre-trial hearing, the court found Martin's initial statements at the scene were taken in violation of *Miranda* and excluded those statements.

At the pre-trial hearing, Emanuel testified he did not read Martin his *Miranda* rights when he first contacted him because he did not know at that point whether Martin was a suspect or a victim. He was not trained to use a two-step technique, and testified he was trained to give a suspect *Miranda* warnings if the suspect was in custody and was being interrogated. Emanuel believed his conversation with Martin at the scene was in connection with an on-going emergency. He was not trying to elicit incriminating statements. The purpose of his questioning was primarily for officer safety. During this conversation Emanuel did not know Fred's condition, other than a gun had been shot at him. It was not until about six minutes into the conversation that Emanuel learned Fred was dead. Emanuel had been employed as a police officer for roughly four years in May 2011. The court specifically found Emanuel a credible witness.

Ellis testified at the pre-trial hearing he did not direct Burton, Emanuel, or anybody else to try to obtain incriminating statements from Martin before a formal interview. Even though Martin said he remembered his *Miranda* rights, Ellis said he read

8

Martin his *Miranda* rights before he questioned him because he wanted to make sure Martin understood his rights. Ellis testified his practice was to tell the officers in the field to "just hold off on any questions and I'll talk to [the suspect] at the station."

In finding there was no deliberate two-step process, the court reasoned the situation at the crime scene was very fluid. Martin had not been placed under arrest, but Emanuel was standing with Martin while other officers were assessing the situation. A conversation took place in which Martin made incriminating statements. The court resolved a conflict in the testimony as to whether *Miranda* rights were given in the field. The court found once the condition of the victim was revealed, Emanuel read Martin his *Miranda* rights. From that point on, Emanuel had no further conversation with Martin other than procedural matters. The court found there was no deliberate attempt by Emanuel to try to solicit incriminating statements in violation of *Miranda*, nor did anyone instruct Emanuel to make that effort.

The court found statements made at all three interviews were voluntary, and indicated it would consider the factors delineated in *Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*). The court noted one hour elapsed between the pre-warning statements and the statements to Ellis in the second interview and the first statements and second statements were made to different officers. The court also described the difference between the first and second interviews in terms of detail and duration.

The court next focused on the "'just for drill'" comment made by Ellis prior to reading Martin his rights at the second interview. The court recognized that an officer cannot trivialize the *Miranda* rights but concluded that based on the totality of the circumstances, Ellis's comment did not undermine the advisement. The court found Martin's statements made to Emanuel at the crime scene were obtained in violation of *Miranda* and were inadmissible. The court found statements at the second and third interviews did not violate *Miranda* and were admissible.

9

DISCUSSION

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* . . . , the scope of our review is well established. 'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033.) "'Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we "'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." [Citations.]'" (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)

Relying on *Seibert*, *supra,* 542 U.S. 600, Martin asserts this court must reverse his conviction because his statements during the second and third interrogations were involuntary due to the two-step interrogation procedure used by the officers. *Seibert* condemned a deliberate police practice of taking a suspect into custody, not giving *Miranda* warnings, obtaining a confession, and then giving *Miranda* warnings and having the suspect repeat the confession.

The United States Supreme Court has twice considered the admissibility of a "second" confession made after the suspect has received a *Miranda* warning and has made an earlier unwarned confession. In *Elstad, supra,* 470 U.S. at page 314, the Court explained that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" concerning the second, post-warning confession. A "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the

10

requisite *Miranda* warnings."  (*Id*. at p. 318.)  A "careful and thorough" midstream warning "ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  (*Id*. at pp. 310, 314.)  In such circumstances, "the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'  [Citation.]"  (*Id*. at p. 311.)  "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."  (*Id.* at p. 314.)

In *Seibert*, *supra,* 542 U.S. 600, the Court considered the situation where a midstream *Miranda* warning was given as part of a deliberate two-step interrogation technique designed to circumvent the protections of *Miranda*.  An officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught:  question first, then give the warnings, and then repeat the question 'until I get the answer that [the defendant has] already provided once.'"  (*Id.* at pp. 605-606.)  Employing this "question-first practice" (*id.* at p. 611), the interrogating officer left the defendant alone in an interview room at the police station for 15 to 20 minutes, then "questioned her without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating" a suggestive, accusatory remark.  (*Id.* at pp. 604-605.)  After defendant confessed and was given a 20-minute break, the officer read her the *Miranda* warnings, resumed the questioning by mentioning their previous conversation, "and confronted her with her prewarning statements[.]"  (*Id.* at p. 605.)  In reaching its conclusion in *Seibert*, the Supreme Court reasoned that despite the midstream *Miranda* warnings, "a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk."  (*Id.* at p. 617, fn. omitted.)

11

Citing *People v. Camino* (2010) 188 Cal.App.4th 1359 (*Camino*), and *People v. Rios* (2009) 179 Cal.App.4th 491 (*Rios*), Martin acknowledges this court and others have held Justice Kennedy's narrow concurrence—restricting exclusion to those cases in which a two-step interrogation procedure is deliberately used—is the law that flows from *Seibert*. But Martin argues "application of the rule interpreting plurality decisions based on the narrowest ground in a concurring opinion obtains an absurd result with regard to S*iebert*" and urges adoption a broader interpretation.[3] We disagree. We find *Camino* well reasoned and persuasive. The concurring opinion of Justice Kennedy represents the *Seibert* holding "[b]ecause [he] 'concurred in the judgment[] on the narrowest grounds' [citation] . . . ." (*Camino*, *supra,* 188 Cal.App.4th at p. 1370.)

"[T]he trial court's determination of deliberateness is a factual finding entitled to deference. . . . California reviewing courts are bound by the trial court's factual findings if supported by substantial evidence (as compared to the clear error standard applicable in federal courts), and we must accord "'""great weight"'"" to the trial court's conclusions. [Citation]." (*Camino*, *supra*, 188 Cal.App.4th at p. 1372.)

Here, the court concluded the interrogating officers did not deliberately use a two-step process to circumvent *Miranda*. The court's conclusion is a factual finding subject to the substantial evidence standard of review. (*Camino, supra*, 188 Cal.App.4th at p. 1372.)

Emanuel was a relatively inexperienced police officer in May 2011. He denied being trained to engage in a two-step interrogation process to circumvent *Miranda*. He credibly explained his reasons for initially failing to read Martin his

---

3       Citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 (*Auto Equity*), the Attorney General suggests this court is bound by *Camino* and *Rios* because "this [c]ourt is bound to follow its own precedent." We disagree. The rule in *Auto Equity* requires a court exercising inferior jurisdiction to follow the decisions of a court exercising a higher jurisdiction. *Camino* was decided by a different panel of this court, and *Rios* is an appellate decision from the Second District. Neither case binds this court.

12

*Miranda* rights. The evidence indicates Emanuel's questioning of Martin took place at a very active crime scene while officers were attempting to determine the status of any victims. There is no evidence Emanuel and Ellis conferred in any way before Emanuel questioned Martin. Substantial evidence supports the court's finding the officers did not deliberately use a two-step technique.

But this does not end our inquiry. A suspect who responds "'to unwarned yet uncoercive questioning'" may later waive his rights and confess after being given a proper *Miranda* warning. (*Camino, supra,* 188 Cal.App.4th at p. 1368.) "[W]here the court finds deliberateness to be absent, 'the admissibility of post-warning statements should continue to be governed by the principles of *Elstad*[*, supra,* 470 U.S. at p. 622]' (Kennedy, J., concurring in the judgment)." (*United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1161.)

In *Elstad*, the court explained that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" concerning the second, post-warning confession. (*Elstad, supra*, 470 U.S. at p. 314.) A "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." (*Id.* at p. 318.) A "careful and thorough" midstream warning "ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Id.* at pp. 310, 314.) In such circumstances, "the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.' [Citation.]" (*Id.* at p. 311.)

Here, the trial court found Martin's statements in all three interviews were voluntary. "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are "'the crucial element of police coercion [citation]; the length of the

13

interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."' [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

When told by Emanuel that he was going to have to remain in handcuffs until the officers had investigated the circumstances inside the mobile home, Martin responded "that was fine because he didn't have anything to worry about, he had just defended himself." These statements were consistent with the statements Martin made to the police dispatcher. After Martin initiated a conversation about the killing, Emanuel asked Martin what had happened. Nothing about this exchange suggests Martin was pressured to make incriminating statements. Rather, the evidence suggests Martin was very willing to explain to the officer why it was necessary for him to shoot his father. Substantial evidence supports the court's finding Martin's statements were voluntary.

Before the second interview, despite being told by Martin that he remembered his *Miranda* rights, Ellis slowly and very carefully advised Martin of his *Miranda* rights. Nothing about Martin's responses suggest he was unwilling to waive his rights and speak to the detective. Substantial evidence supports the court's finding statements at the second interview were voluntarily made.

Prior to the third interview, Ellis asked Martin if he remembered his *Miranda* rights, and Martin responded in the affirmative. Ellis advised Martin his "*Miranda* rights are still in effect." He then asked Martin if he needed his rights read again, and Martin indicated he did not. There is no evidence Martin's responses during the third interview deprived Martin of his ability to exercise his rights under *Miranda*.

14

We agree with the trial court Martin's statements at all three interviews were voluntary.  Viewing the totality of circumstances, Martin's statements in the second and third interviews were not tainted by the initial unwarned statements.  We thus conclude substantial evidence supports the finding of waiver, and we independently conclude the statements were lawfully admitted into evidence.

## DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

RYLAARSDAM, J.

THOMPSON, J.

15