Filed 10/1/18

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C082480 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F02533) |
| v. | |
| EZEKIEL ISAIAH DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Robert M. Twiss, Judge.  Reversed with directions.

Joseph C. Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Ivan P. Marrs, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II-VI.

A jury found defendant Ezekiel Isaiah Delgado guilty of two counts of first degree murder and one count of discharging a firearm at an occupied vehicle, found true a multiple-murder special circumstance and found that Delgado personally used a firearm, causing death.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(3), 246, 12022.53, subd. (a).)  The trial court sentenced him to prison for a total unstayed term of 100 years to life. He timely filed this appeal.

On appeal, defendant first claimed (1) his inculpatory statements to the police should have been excluded on various grounds, (2) no substantial evidence supported the murder charge, (3) the trial court misinstructed on felony murder, (4) the trial court misinstructed on voluntary intoxication, (5) limits on the voluntary intoxication defense violate due process, and (6) he was entitled to a juvenile transfer hearing because of the passage of Proposition 57.  The Attorney General concedes the last point.  We asked for supplemental briefing on several additional issues.

We agree with the parties that we must remand for a juvenile transfer hearing and agree with defendant that--while on remand--the trial court should have the opportunity to consider exercising its newly acquired discretion regarding firearm enhancements, as we describe *post*.  In the published portion of this opinion, part I, we conclude the trial court erred in admitting some of defendant's inculpatory admissions, but find the error harmless beyond a reasonable doubt.  We disagree with defendant's remaining contentions of error, as we explain in the unpublished portions of our opinion.

## BACKGROUND

Near midnight on April 9-10, 2014, defendant, then aged 16, went with Taylor Cober and Elose Brown, purportedly to buy a small amount of marijuana.  The seller (DeShawne Cannon) and his female companion (Gina Elarms) were sitting in a sedan. Brown had $40 and defendant gave Brown his wallet with $25 in it; the total was less than the agreed-upon amount of $70.  Defendant told a detective he thought Cannon was reaching for a gun, so he shot him.  He then shot Elarms because she could identify him,

2

then shot Cannon again. He emptied his 10-shot pistol from behind, striking Cannon five times and Elarms at least three times. His admissions and reenactment were video recorded and shown to the jury. Defendant and Brown each claimed to have taken Elarms's purse, splitting the money contained therein.

Brown and Cober were given immunity and testified they thought the plan was to buy marijuana. Brown heard the shooting but claimed not to have seen it. Later, defendant told Brown he thought Cannon was preparing to shoot and defendant shot him to protect Brown. Cober testified defendant admitted shooting someone. In confusing passages, Cober testified there may have been mention of doing a "lick" (robbery) earlier, but he had thought it was said in jest.

There was corroborative but inconclusive testimony from two witnesses about the perceived ethnicity and clothing of people they saw leaving after the shootings. A review of defendant's telephone revealed searches for stories about the incident and inquiries about Amtrak and Greyhound schedules.

The defense theory was that defendant falsely confessed to protect his friends and earn street credibility. No robbery had been planned. At worst defendant acted rashly, not with deliberation, after he thought Cannon was going to pull a weapon. This would be voluntary manslaughter, via an imperfect self-defense theory.

The prosecutor argued for premeditated murder because defendant had time to reflect, fired at least five times at Cannon, shot Elarms at least three times, then shot Cannon again. Felony murder also could apply because from the evidence it was rational to infer a plan to rob the seller.

The jury convicted defendant as charged.

# DISCUSSION

## I

### *Admission of Inculpatory Statements*

In overlapping claims, defendant contends he was unlawfully arrested, he was questioned in violation of *Miranda*, and his post-*Miranda* statements were tainted by the procedures used by the detectives.  (See *Miranda v. Arizona* (1969) 396 U.S. 868.)  We find error in part, but no prejudice.

A.  *Overview*

Although we do not agree entirely with defendant, we agree that many mistakes were made.  As we will describe, the communication among the involved detectives was inadequate to say the least.

Two seasoned detectives in the first team arrested defendant under the mistaken belief there was an outstanding warrant for his arrest.  They took him in handcuffs to the station, seized his belongings including his cell phone, and left him shackled in an interrogation room for nearly an hour and a half.  They did not tell the second team they had arrested and shackled him.  They did not *Mirandize* him.

When the first detective in the second team found defendant, he immediately unshackled him, told him he was not under arrest and was free to leave, and a ride would be arranged for him.  Defendant answered some questions, but made no inculpatory statements.  After defendant was left in that room again, a second detective from the second team came in and immediately demanded that defendant unlock his cell phone so its contents could be retrieved.  Although this detective also initially told defendant he was not under arrest, when defendant asked how long he would be there, the detective indicated the answer hinged on completion of the data retrieval process.  He then questioned defendant at length.  When defendant eventually admitted that he had shot the victims, a *third* detective in the second team--who had been watching through a one-way mirror--told the second detective via text message that it was time to *Mirandize*

4

defendant. That was done, defendant was invited to repeat what he said, and he repeated and elaborated on his admissions, spontaneously moving chairs to reenact the crimes.

In a detailed written ruling, the trial court found defendant was in custody at the beginning, was freed from custody by the first interrogator, but was not back into custody until he admitted to the second that he had shot the victims. The court found defendant's statements, including those after the *Miranda* warnings, were voluntary, and not the product of a deliberate plan to evade *Miranda*.

We disagree with the trial court's determination of when custody was reinstated. When the second interrogator demanded access to defendant's cell phone and indicated he could not leave until it was examined, defendant was back in custody, and therefore his unwarned statements should have been excluded. No reasonable person would have felt free to leave at that time under these circumstances. However, precedent dictates that absent a deliberate policy or practice to evade *Miranda*, a subsequent voluntary warned confession is admissible notwithstanding a prior unwarned confession. (See *Missouri v. Seibert* (2004) 542 U.S. 600; *People v. Camino* (2010) 188 Cal.App.4th 1359 (*Camino*).) Although all of defendant's unwarned statements should have been suppressed as the products of a custodial interrogation without a *Miranda* waiver, the finding that the subsequent warned confession was voluntary is supported by the record.

The subsequent warned confession was cumulative of and more detailed than the unwarned confession. Therefore, we conclude beyond a reasonable doubt that the *Miranda* violation did not contribute to the verdicts and was not prejudicial to defendant. (See *Chapman v. California* (1967) 386 U.S. 18.)

Our conclusion should not be read to condone the multiple inexplicable failures to communicate and other mistakes demonstrated by this record.

B. *Facts at Suppression Hearing*

Detective Brian Meux (who had about 20 years as a peace officer) testified Cannon's cell phone was found at the crime scene and pointed the investigation to

5

Brown, who had texted Cannon (using the moniker "WK Lynch") about a marijuana deal shortly before the killings. Meux helped execute a search warrant at Brown's residence beginning about 5:15 p.m. on April 11, 2014. Meux and fellow detectives, Angela Kirby and Jason Lonteen, had investigated Brown's associates via sheriff's records and social media, and linked Brown with a man named "Lynch" and defendant. When the warrant was executed, defendant, Cober, Brown, and some of Brown's relatives were present, and the team wanted to talk to all of them.

Although Meux apparently did not know this, Detectives French and Roberts had brought defendant to the station in handcuffs, taken his belongings, and shackled him to the floor of an interrogation room. The video shows they left defendant at about 6:54 p.m. Meux did not come in the room until about 8:18 p.m., meaning defendant was left shackled to the floor and alone in the room for nearly an hour and a half.

Meux testified he first spoke to Brown and his mother, and then went to the room where defendant was held. Meux was surprised to find him in shackles and freed him to use the bathroom; according to Meux, defendant was not then a suspect in the murders. Because of the way he had found defendant, Meux assured him that he was not under arrest, was free to leave, and did not have to talk. The video recording (with audio) shows that Meux offered to get defendant a ride or to have someone pick him up but did not wait for defendant's verbal response before beginning questioning. Meux understood that at Brown's house defendant had given officers a false name, and at some point Meux learned he was on probation. Defendant had said he had an outstanding arrest warrant, but eventually Detective Rose told Meux that he could find no such warrant.

Meux questioned defendant about his whereabouts at the time of the crimes, and although defendant denied involvement he gave answers that conflicted with information Cober had provided, leading Meux to conclude defendant was lying. Accordingly, Meux had pressed defendant to tell him the truth. When he left the room, Meux told defendant he was going to close the door so other people would not see defendant, but that the door

6

was not locked and defendant was not under arrest. Meux left the station to try to find Lynch, who was still considered a prime suspect, but suggested that Detective Lonteen question defendant. Before Meux found Lynch, he heard from Detective Kirby that defendant had admitted the shooting; he told her he had not *Mirandized* defendant, he had merely given defendant the standard *Beheler* admonitions applicable to non-arrested persons. (See *California v. Beheler* (1983) 463 U.S. 1121.)

On cross-examination Meux testified that although he asked defendant if he had been involved in the murder, and told defendant he did not believe him, he still thought defendant was a witness rather than a suspect. Meux also testified that before Lonteen questioned defendant, Detective Rose told Meux that defendant did not have a warrant, and Meux believed Lonteen was present and knew this.

Lonteen (who had 16 years as a peace officer) testified he had been interviewing Brown's mother and sister and did not watch Meux interview defendant. Meux had told Lonteen that Meux did not believe defendant was truthful about his whereabouts, and Meux's summary to Lonteen of defendant's statements did not match what Lonteen had heard from Brown's relatives. Lonteen did not know defendant had been arrested and recalled nothing about a warrant.

The video shows that Meux left the room at about 8:45 p.m., and about 15 minutes later someone showed defendant to the bathroom; defendant was returned to the room at about 9:06 p.m., and about 10 minutes later Lonteen entered the room. Lonteen found that the door was ajar and defendant was not restrained. Lonteen demanded that defendant provide the password to unlock his cell phone (which previously had been taken from him); defendant unlocked it and gave Lonteen the password, and Lonteen told defendant the cell phone's contents would be downloaded by the police.

The transcript shows (consistent with the video) that Lonteen entered the room and immediately after identifying himself said:

"[Lonteen:] [H]ere's the thing dude. *We gotta verify some stuff. We need to get in your phone.* What's the passcode?

"[Defendant:] For - what is this for?

"[Lonteen:] Just to go through - we've got to go through some of this stuff man to make sure you're telling us on the up and up. All right?

"[Defendant:] Yeah.

"[Lonteen:] So I'm trying to help you out by doing that. I just want to try to give you an opportunity so we can do that. So, um, *you can punch it in or I can do it. It's up to you.*" (Italics added.)

Lonteen testified defendant asked him how long defendant would be there because Meux had told him he was free to go; Lonteen confirmed that defendant was free to go. But the transcript (and video) reflects that the following occurred:

"[Defendant:] And, ah, how long am I gonna be here?

"[Lonteen:] *We're trying to figure that out right now . . . .*

"[Defendant:] Because . . the other man [i.e., Meux] told me that I'm not under arrest or anything so.

"[Lonteen:] Okay, yeah. That's true."

"[Defendant:] I just - that - that's why I just want to know how long am I gonna be here.

"[Lonteen:] *We're gonna try to make it not too much longer.* I'm gonna dump this off. I'm gonna have it - I'll be right back to talk to you and just ask you a few more questions, okay?

"[Defendant:] All right.

"[Lonteen:] Um, in case this [cell phone] locks up again what is [the code]?

"[Defendant:] 7400." (Italics added.)

Thus, although Lonteen told defendant the police would try to expedite the download so that defendant could leave, he did not at that point tell defendant he could leave at any time of defendant's choosing. Leaving hinged on completion of the download.

After Lonteen dropped the cell phone off for review, he returned to question defendant, telling him his account of his whereabouts did not make sense. Eventually, after Lonteen repeatedly told defendant he did not believe him, at about 9:56 p.m. (i.e., after about 35 minutes of questioning) defendant admitted he had shot the victims. About six or seven minutes later, Kirby texted Lonteen to tell him to *Mirandize* defendant.

Kirby (who had 20 years as a peace officer) testified that at Brown's residence defendant had given a false name and she knew it was false and that he was on juvenile searchable probation and was an associate of Brown's. Detectives French and Roberts told her defendant had told them he thought he had an outstanding arrest warrant. After Meux's interview, someone told her the lack of a warrant had been confirmed. When she heard defendant make admissions to Lonteen, she texted Lonteen to tell him to *Mirandize* defendant.

After briefly leaving and returning to give defendant some water and chips, Lonteen returned to the room and read defendant his *Miranda* rights; defendant said he understood them. This was at about 10:18 p.m.

Before he was *Mirandized*, defendant had told Lonteen that he and Brown went to buy some marijuana and defendant shot Cannon when he reached for something shiny that defendant feared was a gun; he also shot Elarms. Neither Brown nor Cober knew defendant had a gun. Defendant said he took Elarms's purse after shooting her. The purse was thrown away near an apartment. His friends had nothing to do with any of this.

After the *Miranda* warnings, defendant explained what happened in more detail. In particular, and on his own initiative, defendant moved chairs around to show the

9

position of the victims in the car and where he was when he shot each one. His performance showed he was standing outside the car on the passenger's side, behind the victims. He then demonstrated how he fired his gun at each of them in turn, replete with sound effects. The video shows defendant appeared eager to tell his story and freely did so.

C. *Argument and Ruling*

Defense counsel argued correctly that juveniles do not get bail (see *Tiffany A. v. Superior Court* (2007) 150 Cal.App.4th 1344, 1361), and reasoned therefrom that even if there *had* been an arrest warrant, defendant would have been in custody as a matter of law. If there had not been an arrest warrant, he should not have been arrested at all, meaning the products of his arrest (his admissions) should be excluded. Counsel argued that although there was no evidence of a plan to evade *Miranda*, Lonteen made a decision not to *Mirandize* defendant until Kirby told him to do so, and there was no substantial break in the questioning, therefore the warned admissions should be suppressed.

The prosecutor argued that defendant told the detectives he had an outstanding warrant, and confirmed this at the station before he was told to empty his pockets and shackled to the floor. Meux later unshackled defendant and told him he was free to go.

The trial court gave an initial oral ruling, followed by a more detailed written ruling at the end of trial. The following summary incorporates both rulings.

First, French and Roberts lawfully arrested defendant in the reasonable belief that there was an outstanding warrant for his arrest, based on what defendant himself told them. Defendant was in custody then.

Second, defendant was involuntarily transported to the station, where he was shackled to the floor and had all his property taken, showing he remained in custody. But because he had not said anything the People wanted to introduce, there was no evidence to exclude from that period.

10

Third, Meux expressed genuine surprise at discovering defendant was shackled, unshackled him, told him he was not under arrest and was free to leave, and offered him a ride. At that point defendant was freed from custody; this was not a planned ruse to trick him into talking, even given defendant's age.

Fourth, once defendant told Lonteen that he shot the victims, he was again in custody because no reasonable person (whether an adult or a 16-year-old) would think he or she could leave.

Fifth, the officers had no policy or plan to circumvent *Miranda*.

Sixth, defendant's statements were voluntary.

Accordingly, the motion to suppress was denied.

D. *Analysis*

1. Arrest and Detention

We first address defendant's claim that his arrest and detention were unlawful. Defendant's view is that such unlawfulness tainted the inculpatory statements later elicited. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 485 ["verbal evidence which derives so immediately from . . . an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion"]; *Brown v. Illinois* (1975) 422 U.S. 590, 601-604 [*Miranda* warnings do not necessarily attenuate the taint of an unlawful arrest]; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 440-442.)

We find the officers had probable cause to arrest defendant.

> "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . .' [Citation.] It is incapable of precise definition. [Citation.] ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be . . . seized.' [Citation.]" (*People v. Celis* (2004) 33 Cal.4th 667, 673.)

11

The record shows defendant was known to be on probation and told detectives both at the Brown residence and at the station that he thought there was an outstanding warrant for his arrest. As the Attorney General argues, it was rational for the officers to believe defendant, arrest him, and detain him until they learned otherwise. (See 2 LaFave, Search and Seizure (5th ed. 2017) Probable Cause, § 3.6(f), pp. 448-456 [first-hand information can supply probable cause].)

Defendant secondarily claims it took the officers too long to discover that he was wrong about having an outstanding warrant, thus his detention was unlawfully prolonged. The record does not explain exactly when the detectives learned there was no arrest warrant, but it was before Lonteen entered the room. And although defendant refers to "hours" in custody, Meux effectively freed defendant (by telling him he could go and offering him a ride) after 84 minutes. This timeframe was consistent with Meux's testimony that before Lonteen questioned defendant, Meux had heard from Rose that there was no warrant. We cannot say 84 minutes was too long *as a matter of law* for the officers to ascertain that no warrant existed, given the circumstances. Until the absence of a warrant was determined, the detectives had no basis to release defendant, and nothing in the record shows that discovery of the lack of a warrant could have been made sooner. (Cf. *People v. McGaughran* (1979) 25 Cal.3d 577, 586.)

In the context of a vehicle stop, we explained how to evaluate claims of prolonged detention:

> "An investigatory stop exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible. [Citation.] Circumstances which develop during a detention may provide reasonable suspicion to prolong the detention. [Citation.] There is no set time limit for a permissible investigative stop; *the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly*. [Citations.]" (*People v. Russell* (2000) 81 Cal.App.4th 96, 101-102, italics added.)

That presents the partly factual question of how long it should have taken to confirm or dispel defendant's own belief that he was a wanted juvenile. The record does

12

not show that 84 minutes was too long. (Cf. *People v. Gabriel* (1986) 188 Cal.App.3d 1261, 1265 [rejecting claim that a detention while a search warrant was being executed was too long "simply because of its one-and-a-half to two-hour length" because "the record is devoid of any evidence that the officers engaged in any misconduct or in any way delayed the search"].)

Thus, we reject defendant's claim that the detention was unlawfully prolonged. For this reason, we need not address whether everything else that followed was the product of an unlawful arrest or unduly prolonged detention.

### 2. *Miranda* violation

Defendant contends all his statements should have been suppressed for violation(s) of the *Miranda* rules, arguing that he was in custody from the beginning. We agree with defendant in part, as we now explain.

> " 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* . . . , the scope of our review is well established. "We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." ' [Citation.] ' "Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' " ' [Citation.]" (*Camino*, *supra*, 188 Cal.App.4th at pp. 1370-1371.)

*Miranda* applies only to *custodial* interrogations, and whether a person is in custody hinges on whether a reasonable person in her or his shoes would feel free to leave. (See *Howes v. Fields* (2012) 565 U.S. 499, 508-509; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161-1162.) We take the juvenile's age into consideration when determining whether a reasonable person would feel free to leave under the same circumstances. (See *In re I.F.* (2018) 20 Cal.App.5th 735, 760.) Although Meux

effectively freed defendant from custody, Lonteen renewed his custodial status, as we now explain.

We begin by pointing out the obvious: that cell phones are now ubiquitous and often contain highly private personal information. Although the trial court found that: "When Lonteen entered the interview room with defendant Delgado, he introduced himself and *asked* Delgado for the access code for his cell phone so he could do a 'dump' of its contents" (italics added), this finding is not fully supported by the record. Lonteen *demanded* access. When defendant asked when he could leave, Lonteen indicated it depended on when the data was obtained. In effect, defendant asked to leave and Lonteen denied his request.

At that point defendant, aged 16, had been arrested, taken in handcuffs to the station, shackled to the floor of an interrogation room, forced to give up his possessions, and left alone in that room for nearly an hour and a half. Although Meux thereafter effectively freed him, there were lingering indicia of custody that must be factored in to the reasonable-person calculus to answer the custody question as of the time Lonteen spoke to defendant. At that moment, defendant told Lonteen that Meux had told defendant he was free to leave. Lonteen then demanded access to defendant's cell phone, and when defendant asked when he could leave, indicated the data extraction *would have to be done first*. Given the entire course of events, no reasonable person, whether adult or juvenile, would have felt free to leave at that time. Accordingly, Lonteen should not have asked defendant any questions before *Mirandizing* him. Therefore, all of defendant's unwarned statements should have been suppressed, and the trial court's denial of the motion was error.

### 3. *Seibert* and Voluntariness

The trial court found the *warned* admissions were not the product of a planned effort to undermine the *Miranda* rule, but flowed from missteps and miscommunications. The court's finding that there was no subjective plan to evade *Miranda* is reviewed for

14

substantial evidence. (See *Camino*, *supra*, 188 Cal.App.4th at pp. 1364, 1372; *People v. Rios* (2009) 179 Cal.App.4th 491, 507 (*Rios*).) There were multiple opinions in *Seibert*, which addressed this issue. The tie-breaking vote was by Justice Kennedy. Accordingly, we look to his opinion to determine the ground on which a majority of the high court agreed. (See *Camino*, *supra*, 188 Cal.App.4th at p. 1370 & fn. 5; *Rios*, *supra*, 179 Cal.App.4th at pp. 504-505.)

As background, *Oregon v. Elstad* (1985) 470 U.S. 298 had rejected a "cat out of the bag" approach dictating that once an unwarned statement is made a subsequent warned statement is inadmissible because a person cannot effectively take back what she or he has said. Instead, *Elstad* held in part: "[T]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Oregon v. Elstad*, *supra*, 470 U.S. at p. 309.)

In *Seibert*, Justice Kennedy stated his controlling views in part as follows:

> "*Elstad* reflects a balanced and pragmatic approach to enforcement of the *Miranda* warning. *An officer may not realize that a suspect is in custody and warnings are required. . . .*" (*Missouri v. Seibert*, *supra*, 542 U.S. at p. 620, opn. of Kennedy, J., italics added.)

> "This case presents different considerations. The police used a two-step questioning technique based on a deliberate violation of *Miranda*. The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given." (*Id*. at p. 620.)

> "*When an interrogator uses this deliberate, two-step strategy*, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." (*Id*. at p. 621, italics added.)

> "I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used *in a calculated way* to undermine the *Miranda* warning. [¶] The admissibility of postwarning statements should continue to be governed by the principles of *Elstad*

15

unless the deliberate two-step strategy was employed." (*Id.* at p. 622, italics added.)

In short, *Seibert* categorically barred admission of warned statements, whether voluntary or not, that are obtained by a deliberate attempt to thwart the *Miranda* safeguards. (See *Camino*, *supra*, 188 Cal.App.4th at pp. 1369-1370; *Rios*, *supra*, 179 Cal.App.4th at pp. 504-505.) The trial court made a factual finding that no proscribed two-step technique was employed in this case, and that finding is supported by the evidence recounted *ante*.

In various ways, defendant tries to fit this case within *Seibert*. In support, he relies on authority listing some objective indicia courts may consider in determining whether an intentional procedure was used to circumvent *Miranda*. (See, e.g., *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1158-1159; *Camino*, *supra*, 188 Cal.App.4th at p. 1370.) Although we ultimately determine the admissibility of evidence in the face of *Miranda* or voluntariness challenges, we are reviewing the trial court's factual finding regarding intent. " 'It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.' " (*Postal Service Bd. of Governors. v. Aikens* (1983) 460 U.S. 711, 716-717; see *United States v. Williams* (2008) 553 U.S. 285, 306-307; *People v. Johnson* (1901) 131 Cal. 511, 514.) We take Justice Kennedy's opinion as written: It requires a finding of a deliberate intent and plan to circumvent *Miranda*. We uphold the trial court's finding there was no such intention.

The record, far from suggesting any deliberate protocol to undermine *Miranda* guided the detectives, instead suggests they acted with little or no method at all. Further, we agree with the trial court that defendant's warned statements were voluntary.

"Where the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If conflicting testimony exists, the court

16

must accept that version of events that is most favorable to the People to the extent it is supported by the record. [Citation.]" (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 207-208.)

" '[T]he question in each case is whether the defendant's will was overborne at the time he confessed. . . . The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.] 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401.)

"A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citations.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions. [Citations.]" (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 534.)

We have watched the lengthy video and are convinced that no police coercion occurred and that defendant's will was not overborne. Defendant presents as a mature and savvy youth; he never appears cowed or browbeaten. The questioning was not abusive, and defendant had three restroom breaks, was given water twice, and was given a snack. During the post-warning period, entirely on his own initiative, he acted out the murders complete with sound effects. Nothing in the video indicates that defendant felt coerced in the constitutional sense of the term at any time while he was being questioned.

Defendant's briefing points out that after defendant admitted the killings but just before he was *Mirandized* he asked: "Do you think I can make a phone call?" Lonteen told him he could, and when defendant asked if that meant only one Lonteen told defendant he could make more than one, then *Mirandized* him. But defendant did not ask to make any calls *at that moment*, and therefore this does not show his statements were

17

involuntary. Put another way, this incident did not signal to defendant that he was being held incommunicado, as his briefing seems to imply. Nor do we find anything menacing in the fact that two different detectives questioned defendant over a few evening hours while expressing disbelief at his exculpatory story. The video refutes the claim of involuntariness.

Defendant suggests that he never voluntarily waived his *Miranda* rights. We disagree. After Lonteen *Mirandized* defendant and defendant separately said he understood each one of the four *Miranda* rights, the following occurred:

> "[Lonteen:] Okay, I'm gonna kind of go back over a lot of these things that we talked about and make sure that again, I understand the right story. Are you okay with that?
>
> "[Defendant:] You say what?
>
> "[Lonteen:] Are you okay with doing that?
>
> "[Defendant:] Going back?
>
> "[Lonteen:] Just - just kind of going through again and making sure that I understand all the story.
>
> "[Defendant:] Yeah, yeah, yeah."

Although the better practice is to obtain an explicit waiver of *Miranda* rights, an explicit waiver is not required. Lonteen ensured defendant understood his rights and wanted to talk; although not ideal, that was sufficient. "The core issue in ruling on a challenge to a *Miranda* waiver is whether an in custody accused made an uncoerced and fully aware choice not to assert the right to counsel or silence." (*Rios*, *supra*, 179 Cal.App.4th at p. 499; see *People v. Whitson* (1998) 17 Cal.4th 229, 245-250.) Defendant was aware of his choices and chose to talk. Because defendant's warned statements were voluntary and there was no plan to bypass *Miranda*, the warned statements were admissible under *Seibert* and related cases.

18

4. Prejudice

Because the trial court allowed the jury to hear (and watch) the unwarned admissions, we must decide whether the error was harmless beyond a reasonable doubt.

> "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*People v. Neal* (2003) 31 Cal.4th 63, 86; see *People v. Elizalde* (2015) 61 Cal.4th 523, 542.)

Another way to phrase the *Chapman* test is this: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827.) Here, the answer is "yes."

Although we reject the Attorney General's initial view that the testimony of defendant's companions that night coupled with vague corroboration from eyewitnesses renders the error harmless, we agree that defendant's warned statements fully encompassed his unwarned statements, were more detailed, and included his spontaneous and vivid reenactment of the crimes. Defendant does not point to anything significant in the unwarned statements that was not repeated during the warned statements. Although during argument the prosecutor mentioned the point at which defendant said he would tell the truth, the prosecutor repeatedly emphasized the physical reenactment and described how that fit with the forensic evidence, arguing this showed defendant was telling the truth. Thus, the inadmissible evidence was at worst partly cumulative of the admissible evidence. Although defendant contends the statements were "joined at the hip" and "interlocking," because all the statements (and actions) were video recorded, there was no uncertainty about what defendant said or did. The jury would either find defendant meant what he said or find he was trying to protect his companions and earn

19

street credibility by assuming liability for the shootings. Contrary to defendant's view, that calculus would not have changed if the more limited unwarned statements had been suppressed, as they should have been. Therefore, we can be sure that the verdicts were not attributable to the *Miranda* error.

The fair administration of justice demands that peace officers be trained in *Miranda* procedures and adhere to their training. The system did not function in several ways in this case. But the mistakes made did not prejudice defendant.

## II

### *Substantial Evidence of Murder*

Defendant contends no substantial evidence supports the murder convictions. We disagree with this view of the trial evidence.

Much of defendant's briefing reweighs evidence or chooses between competing inferences, but we must " 'review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Under this standard of review, defendant's contentions fail.

A. *Premeditated and Deliberate Murder*

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Our Supreme Court has established guidelines for our review, as follows:

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts

20

about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

The above passage established "guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid*.) Or as we have said before, the factors are not "a straightjacket on the manner in which premeditation can be proven adequately at trial." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

Here, there is evidence of all three of the *Anderson* guideline factors.

There was evidence of planning because defendant went to what was purportedly expected to be a peaceful and petty drug transaction while armed with a concealed pistol. (Cf. *People v. Sanchez* (1995) 12 Cal.4th 1, 34 [retrieving knife from kitchen as planning activity]; *People v. Wharton* (1991) 53 Cal.3d 522, 547 [bringing hammer from garage as planning activity].) He then placed himself outside Cannon's car and behind the seated victims. He then shot them multiple times from behind. The jury could infer from defendant's course of conduct that he planned the killings from the beginning. It was not

21

required to believe his story that he thought Cannon was reaching for a weapon and that he shot the seller to protect himself or protect Brown.

There was evidence of motives to kill each of the victims. The jury could find defendant's plan was to take whatever he could from Cannon, which is why defendant brought the loaded gun in the first place. The jury could also accept as true defendant's statement that he shot Elarms to eliminate a witness.

The manner of the killings also suggested premeditation and deliberation. Defendant shot Cannon several times, then shot his companion to eliminate her as a witness, then returned his attention to Cannon and emptied his pistol into him. Thus, the jury could rationally find that there were two clear intervals in which defendant could have reflected on the consequences of his actions. (See *People v. Stitely* (2005) 35 Cal.4th 514, 544 ["ample opportunity to consider the deadly consequences of his actions"]; *People v. Perez, supra*, 2 Cal.4th at pp. 1127-1128.) The jury also could find firing multiple gunshots from behind into seated victims "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' " to kill. (*People v. Anderson*, *supra*, 70 Cal.2d at p. 27.)

The post-shooting conduct also speaks to defendant's mental state. The killings allowed defendant (or Brown) to take Elarms's purse and flee, facts supporting a motive (to steal whatever they could) and showing a lack of concern for either victim. (See, e.g., *People v. Lasko* (2000) 23 Cal.4th 101, 112 ["defendant's actions *after* striking the fatal blow were not those of an unintentional killer: he did not call an ambulance, he tried to obscure evidence of the killing"].)

In short, the jury was presented with substantial evidence from which it could find first degree murder of both victims based on a theory of premeditation and deliberation.

B. *Felony Murder*

Defendant contends no substantial evidence supports a theory of robbery murder. Drawing reasonable inferences from the evidence in support of the verdict, we disagree.

22

The jury could infer there was a plan to rob Cannon, making the killings felony murders. The fact none of the surviving participants to the sale *admitted* this was the plan does not conclusively negate that idea, as defendant's briefing suggests.

Brown communicated with the seller using a telephone associated with Lynch. The jury could infer the use of someone else's telephone was designed to mask something sinister. The evidence shows the proposed deal was for $70, but Brown and defendant together did not have enough money to complete the agreed-upon transaction. Defendant brought a loaded pistol to the supposed drug sale. After the killings, defendant and Brown divvied up the money from one victim's purse. On these facts, the jury could find both he and defendant (and perhaps Cober as well) planned a robbery from the beginning.

In reaching this conclusion we place no reliance on Cober's testimony about a "lick." That testimony was so confused and contradictory that we will not infer he meant a robbery was planned that night. (See *People v. Raley* (1992) 2 Cal.4th 870, 891 ["Evidence is sufficient to support a conviction only if . . . it ' "reasonably inspires confidence" ' . . . and is 'credible and of solid value' "].) But this does not weaken the *other* evidence from which the jury could infer a robbery was planned that night. Accordingly, this theory was supported.

### III

### *Instructions on Felony Murder*

Defendant contends the trial court should not have instructed on felony murder, because no substantial evidence supports that theory. We disagree.

Over defense counsel's objection, the trial court found there was substantial evidence presented to the jury to warrant felony murder instructions. For the reasons

23

stated in Part II-B, *ante*, we agree.  Accordingly, we reject the claim of error based on the felony murder instruction.[1]

IV

*Voluntary Intoxication*

Defense counsel wanted voluntary intoxication instructions and the People objected, claiming no substantial evidence warranted them.  Based on evidence defendant smoked marijuana that night, the trial court gave CALCRIM No. 625, and defense counsel did not object to the content of that instruction.

Initially, we point out the evidence of intoxication due to defendant's smoking an unknown amount of marijuana that night was weak and was not mentioned by the defense during closing argument.  Thus, the instructional claim seems academic.

CALCRIM No. 625 as given in this case provided in relevant part as follows:

> "You may consider evidence, if any, of the Defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the Defendant acted with an intent to kill, or the Defendant acted with deliberation and premeditation, or with regard to felony murder, whether the Defendant had the intent to permanently deprive the owner of his or her property.

> "[¶] . . . [¶]

> "You may not consider evidence of voluntary intoxication for any other purpose."

Defendant now contends CALCRIM No. 625 does not properly instruct the jury that it "must" consider evidence of voluntary intoxication, but instead improperly states

---

[1] Even if we agreed with defendant, the submission to the jury of a factually unsupported theory of liability does not require reversal because "If the inadequacy of proof is purely factual . . . , reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)  Such an error is not one of federal constitutional dimension.  (*Id*. at p. 1130.)  Further, nothing in the record shows the jury relied on the robbery murder theory.

24

the jury "may" consider such evidence. He separately attacks the statutory scheme behind the pattern instruction, claiming it improperly prevented the jury from considering voluntary intoxication on the question of self-defense, particularly unreasonable self-defense. We disagree with both contentions.

Taking the last point first, we solicited supplemental briefing in light of our Supreme Court's recent decision in *People v. Soto* (2018) 4 Cal.5th 968, which held that "CALCRIM No. 625 correctly permits the jury to consider evidence of voluntary intoxication on the question of whether defendant intended to kill but not on the question of whether he believed he needed to act in self-defense." (*Id.* at p. 970.)

In light of *Soto*, defendant now concedes we are bound to reject his claim about the substantive limitations set out in the instruction, but he seeks to preserve the issue for possible federal review. We agree that *Soto* undermines his second claim.

As for defendant's first claim, CALCRIM No. 625, like many pattern instructions, uses the term "may" to indicate that the jury may or may not find true the facts tendered in support of the instruction, and that if it does, the jury may or may not draw certain inferences therefrom. Thus, as *Soto* confirmed, "CALCRIM No. 625 correctly *permits* the jury to consider evidence of voluntary intoxication on the question of whether defendant intended to kill but not on the question of whether he believed he needed to act in self-defense." (*People v. Soto*, *supra*, 4 Cal.5th at p. 970, italics added.) But defendant contends the instruction should have *commanded* the jury to consider the evidence, arguing as follows: "In order for the defendant to receive a fair trial, the intoxication instruction needs to apprise jurors they 'must,' not 'should,' consider all the evidence regarding intoxication."

Defendant relies primarily on a case faulting an instruction on the now-abolished defense of diminished capacity that held: "The jury may not *believe* the defense evidence on diminished capacity, but it *must* take it into consideration in its deliberations if the defendant is to have a fair trial on all the issues raised." (*People v. Stevenson* (1978)

25

79 Cal.App.3d 976, 987.) Defendant insists that by extension this means CALCRIM No. 625 should have used the word "must," not "may."

We do not agree that the use of the term "may" deprived defendant of a fair trial on the relevant issues because the argument overlooks the effect of other instructions. (See, e.g., *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.) Several prior cases have distinguished *Stevenson* because generally other instructions tell the jury to consider *all* of the evidence. (See *People v. Reza* (1981) 121 Cal.App.3d 129, 132-133; *People v. Tanner* (1979) 95 Cal.App.3d 948, 959; *People v. Yoder* (1979) 100 Cal.App.3d 333, 338-339.) The jury in this case was told it "must decide what the facts are" "based only on the evidence" presented at trial. (CALCRIM No. 200.) It was told it "must impartially compare and consider all the evidence" in the case. (CALCRIM No. 220.) And, consistent with permissible inferences under instructions, the People argued defendant was not so intoxicated that he did not form the intent to kill.

Thus, it is not reasonable to suppose the jury would have disregarded the evidence of intoxication arbitrarily. By correlating all the instructions the jury would have understood it had to consider all of the evidence presented during trial.

Accordingly, we reject the claim of instructional error.

V

*Proposition 57 Remand*

Defendant was a juvenile at the time he murdered his two victims.

"While this appeal was pending, Proposition 57, also known as 'The Public Safety and Rehabilitation Act of 2016,' became effective. Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing by prosecutors. Certain categories of minors . . . can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. (Welf. & Inst. Code, § 707, subd. (a)(1).)" (*People v. Vela* (2018) 21 Cal.App.5th 1099, 1103.)

26

In light of this change, the parties agree that defendant is entitled to a remand for a hearing by the juvenile court to determine whether his case should be transferred to criminal court. We agree. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304.)

We will conditionally reverse and direct the juvenile court to conduct a juvenile transfer hearing. "If, after conducting the juvenile transfer hearing, the court determines that it would have transferred [Delgado] to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then [his] convictions are to be reinstated. [Citation.] . . . On the other hand, if the juvenile court finds that it would not have transferred [Delgado] to a court of criminal jurisdiction, then it shall treat [his] convictions as juvenile adjudications and impose an appropriate 'disposition' within its discretion." (*People v. Vela*, *supra*, 21 Cal.App.5th at p. 1113.)

## VI

### *Senate Bill No. 620*

At the time of the crimes and sentencing, the trial court lacked authority to strike the firearm enhancements. Such discretion was later conferred via Senate Bill No. 620 (2017-2018 Reg. Sess.), which in relevant part amended Penal Code section 12022.53, subdivision (h) to allow a court "in the interest of justice pursuant to Section 1385" to "strike or dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, § 2.) We have held that this expansion of sentencing discretion applies retrospectively to non-final cases. (See *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) In supplemental briefing, the parties address whether we should remand for resentencing on the firearm enhancements.

As we discussed *ante*, we are already remanding this matter to the juvenile court. Thus, we see no need to depart from the general rule that remand is appropriate to permit the trial court to consider exercising its newly-acquired discretion. (See *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

27

## DISPOSITION

The judgment of the criminal court is conditionally reversed. The cause is remanded to the juvenile court with directions to conduct a transfer hearing as discussed within this opinion, no later than 90 days from the filing of the remittitur.

If, at the transfer hearing, the juvenile court determines that it would *not* have transferred defendant to a court of criminal jurisdiction, the verdicts shall be treated as juvenile adjudications and a dispositional hearing shall be held in due course. If the juvenile court determines that it *would* have transferred defendant to a court of criminal jurisdiction, defendant's convictions shall be reinstated as of that date.

If the convictions are reinstated, the criminal court is then directed to conduct a resentencing hearing within 30 days, consistent with the unpublished portion of this opinion.

/s/
Duarte, J.

We concur:

/s/
Raye, P. J.

/s/
Butz, J.

28