Filed 7/23/25  P. v. Adan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEJANDRO ADAN,<br><br>    Defendant and Appellant. | D085709<br><br>(Super. Ct. No. INF1900815) |

APPEAL from a judgment of the Superior Court of Riverside County, James B. Jennings and Jorge C. Hernandez, Judges.  Affirmed in part, reversed in part, and remanded with instructions.

Robert L. Hernandez, under Appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Liz Olukoya, Deputy Attorneys General, for Plaintiff and Respondent.

Alejandro Adan stole Jane Doe's hotel room key, used that key to enter her room while she was intoxicated and sleeping, touched her vagina with his fingers, and then raped her. A jury convicted him of six counts including assault with intent to commit rape during the commission of a burglary of the first degree, first degree burglary, sexual penetration of an unconscious and intoxicated person, and rape of an unconscious and intoxicated person. The trial court sentenced Adan to an indeterminate term of seven years to life in prison on the assault count and stayed midterm sentences on the remaining counts pursuant to Penal Code section 654.[1]

Adan contends the trial court erred in admitting his post-*Miranda*[2] confession at the jail because it followed an un-*Mirandized* custodial interrogation earlier that same day at the hotel where he worked. We conclude that the officers did not employ a deliberate strategy designed to undermine the purpose of *Miranda* warnings as prohibited by *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), and that Adan's voluntary post-*Miranda* statements at the station were admissible pursuant to *Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*).

Adan also asserts that his conviction for first degree burglary should be dismissed because it is a lesser included offense of assault with intent to commit rape during a first degree burglary, and that his abstract of judgment inaccurately indicates his conviction for rape of an intoxicated person is a "violent felony." The People concede both points, and we accept the concessions.

---

[1] All further statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

We therefore reverse count 2, the first degree burglary count, and instruct the trial court to issue an amended abstract of judgment reflecting its dismissal of count 2 (§ 459) and removing the designation "Violent Felony" connected with count 6 (§ 261, subd. (a)(3)). We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Assault and Rape*

In March 2019, then 21-year-old Jane Doe stayed with her mother, S.J. (Mother) and stepfather, T.J. (Stepfather) in connecting rooms at a hotel in Palm Springs. The day after they checked in, Doe and Mother spent time at the hotel's rooftop pool, where they met and exchanged small talk with Adan, a 29-year-old server at the poolside bar. The following afternoon, Doe and Mother spent several more hours at the hotel pool, where Adan was again their server. Doe and Mother ate lunch and drank four or five drinks apiece over the course of the afternoon. Doe and Mother engaged in friendly small talk with Adan throughout their time at the pool.

By the end of the afternoon, Doe was very intoxicated. She was giggling, laughing, and struggling to stand up on her own. As they were getting ready to leave, Mother noticed that Doe's wallet was missing. Adan tried unsuccessfully to help find Doe's missing wallet among the couch cushions and in the towel bin.

In response to his request, Doe gave Adan her phone number. As Doe walked to the restroom to continue looking for her wallet, Adan asked if Doe had her own room at the hotel. She answered that she did. He then asked for her room number and whether it would be okay if he came by. According to Adan, while they were near the bathroom they leaned towards each other and kissed, and Doe told him her hotel room number. Adan said he would

3

text her in a little bit. Mother walked a still very-intoxicated Doe back to her hotel room. She helped Doe undress, shower, and get into bed.

Doe acknowledged being very intoxicated that day and she did not remember leaving the pool at all. She remembered an interaction with her mom by the pool about having one more drink, and the next thing she remembered was being in the shower. Doe did not recall giving Adan her number, although she later provided investigators a screen shot of a text message she received from Adan. She also did not remember losing her wallet that day or whether she told Adan it was okay to come to her room.

After Doe and Mother left the pool, Adan called down to the lobby and learned that someone had turned in a lost wallet. He went to the front desk, retrieved the wallet, and looked through it to make sure it belonged to Doe. He saw Doe's hotel room key in the wallet and took it.

Adan went to Mother's room and returned Doe's wallet to Mother, who thanked him. Shortly thereafter, Adan appeared again at Mother's door. He said the phone number Doe had given him was wrong. Mother did not realize that Doe had given him her number, which was off by one digit, but she gave him the correct number. Mother also told Adan that Doe was not feeling well and was in no condition to go out that night.

Adan left work but then decided to return to the hotel. He knocked softly on Doe's hotel room door. After receiving no response, he used the room key he had taken from Doe's wallet to enter her room. Doe was lying on the bed wrapped in a towel, asleep. Adan nudged Doe and asked if she was okay. She did not respond. Adan laid down next to her and started touching her. He touched her legs, breasts, and butt. He put his fingers in her vagina. He then took off his pants and underwear and inserted his penis into Doe's vagina.

4

Doe awoke to the feeling of someone having sex with her. She first thought it was her ex-boyfriend but then realized that something was wrong. She ran to the adjoining door and yelled for her mom, saying, "[T]here's a man in my room. There's a man in my room." She was hysterical.

Mother and Stepfather ran into the room. Doe said, "He had sex with me. He had sex with me, and it was not okay." Mother pulled her into the adjoining room, closed the door, and ran out of the room to get help.

Stepfather entered the room and saw Adan pulling up his shorts and fastening his belt. Stepfather closed the door between the two rooms and asked Adan, "What are you doing here?" Adan recalled that Stepfather also said, "[Y]ou're staying here. Sit down. Tell me what happened." Stepfather testified that Adan's answer was something like, "I don't know. I messed up. I don't know." Stepfather described Adan as "fairly talkative," "pretty forthcoming," and apologetic.

## B.    *The Hotel Room Interview*

Palm Springs Police Officer Lembit Kulbin was dispatched to investigate a possible rape at the Rowan Hotel. Kulbin first spoke to the hotel manager and Stepfather. Stepfather said the suspect was still in the hotel room. Kulbin asked Stepfather for permission for police to enter the room. Kulbin spoke further with Stepfather while two other police officers went to the hotel room. Stepfather told Kulbin that Adan was apologizing to Stepfather the entire time they were in the room.

The other officers had been in the room with Adan for less than seven minutes when Kulbin arrived. Adan was slumped over on one of the two beds in the room. Kulbin stood in front of Adan, to his right. One of the officers remained in the room for only five to ten minutes of the ensuing conversation.

5

Kulbin had no idea if there had been a mutual sexual encounter between Doe and Adan, or if something else had happened. As Kulbin explained, "I went into it pretty blind. And that's why I treated Mr. Adan the way I did . . . because I didn't know what it was at that time." When asked whether he had enough probable cause to arrest Adan at that point, Kulbin testified that he did not.

Kulbin approached Adan in the hotel room, greeted him and introduced himself and his purpose, saying, "Okay, um, we're, we're tryin' to figure out what—why we're here, number one—and um, what's going on—what drew a lot of attention to this room and the room next door today. Okay?" Kulbin confirmed that Adan could speak English and then asked about the day's events:

> "[Kulbin:] Um, can you kinda—I don't know, did you just meet these guests today?
>
> "[Adan:] Uh, Friday.
>
> "[Kulbin:] On Friday? Okay. And can you kind of tell me what—since Friday, uh, uh, just a running account—"

Adan's response was just that—a running account of the events of the afternoon. He quickly admitted taking Doe's room key out of her purse, then later returning to Doe's room and using the stolen key to unlock the door. Adan said that when he entered the room, he nudged Doe on the bed and asked if she was okay. He then climbed into bed next to her and started touching her body. Adan admitted he put two fingers into Doe's vagina. He also said he put his penis inside Doe.

At some point Doe awoke and ran to the other room. Adan said he was getting up and putting his pants on when a man came in, asking, "[W]hat are you doing in here," and "What'd you do?" Adan told Kulbin that he had been

6

honest with Stepfather. He said he wet his pants because he thought Stepfather "was going to beat my ass. . . . I was ready for him to fuckin' just throw me off that damn roof." "And I knew I fucked up, man," he continued. "I was scared to death. [¶] And I know I, I know what I did. I know what I did."

The interview of Adan in the hotel room lasted about 22 minutes. Other than the departure of one of the three officers initially present, the circumstances did not change over the course of the interview. At no time did officers inform Adan of his *Miranda* rights or tell him he was free to leave. When asked why he did not give a *Miranda* warning, Kulbin answered that Adan was just being detained for the investigation. It did not occur to Kulbin to stop and advise Adan of his *Miranda* rights during the conversation; the investigation was just preliminary and he was determining whether he had probable cause to arrest Adan.

After the interview with Adan, the officers collected evidence, including bedsheets and male underwear on the floor. Officers then arrested Adan.

## C.    *The Interview at the Jail*

About two hours later, Barron Lane, a detective assigned to investigate sexual assaults, was informed by a superior officer that "there was a sexual assault investigation beginning . . . , that a Mr. Adan Alejandro had already been interviewed," and that Lane was being called in to "do a *Miranda* interview with Mr. Adan." Once Lane arrived at the station, he spoke with a sergeant briefly and with the officers who had spoken with the victim. Lane knew that a statement had already been taken from Adan and some of its contents.

Lane escorted Adan from the jail cell to an interview room, which had video and audio recording capability. Lane introduced himself, then informed

Adan of his *Miranda* rights. No one else was in the room. As reflected in the recording, the interaction unfolded as follows:

> "[Lane:] If you can take a seat right there in the chair.
>
> "[Adan:] Okay.
>
> "[Lane:] Just, just right there, if you don't mind, please. Okay. Uh, Mr. Aden [*sic*], right, sir?
>
> "[Adan:] Yes, sir.
>
> "[Lane:] Is it okay if I call you Alejandro?
>
> "[Adan:] Yes.
>
> "[Lane:] Okay. Alright. Um, Alejandro, real quick, I'm just gonna make you aware of your rights. Okay?
>
> "[Adan:] Mhm.
>
> "[Lane:] Um, you have the right to remain silent. Do you understand that?
>
> "[Adan:] Mhm.
>
> "[Lane:] And if you could just tell me yes or no, whether or not you understand those, I'd appreciate it. Do you understand that you have the right to remain silent?
>
> "[Adan:] Yes."

Officer Lane continued to prompt Adan to answer clearly whether he understood his rights:

> "[Lane:] Okay. Anything you say can and will be used against you in a court of law. Do you understand that?
>
> "[Adan:] Mhm.
>
> "[Lane:] And again, if you could you just say yes or no when you answer these questions.
>
> "[Adan:] Okay.

8

"[Lane:] That way I, I know that you understand what I'm saying.

"[Adan:] Yes.

"[Lane:] Okay. So, do you understand anything you say can and will be used against you in a court of law?

"[Adan:] Yes."

As Lane advised Adan of additional rights, he answered "yes" to understanding each of the rights. Adan then agreed to speak with Lane:

"[Lane:] Okay. Do you understand each of these rights that I've given you?

"[Adan:] Yes.

"[Lane:] Okay. Um, with all those rights in mind, can I speak with you today?

"[Adan:] Yes.

"[Lane:] Is that okay? Okay. Um . . . I've never met you before. Again, my name's Barron. Um, I'm a detective here at the Palm Springs Police Department. Um, I'd like to speak with you about what happened today, if that's alright. Would it be okay if you just told me what happened?

"[Adan:] Yes.

"[Lane:] So, what happened?

"[Adan:] I just, just—Oh, man. I don't—it's like, damn. I don't even know what to do at this point, I never been at this point—so I don't even know, like—I already told the police officer what happened."[3]

_____

[3] The transcript inaccurately transcribed the last part of Adan's response as: "so I don't even know like, how to really tell the police officer what happened."

Lane inquired, "What did—what did um, what did you tell 'em?" Adan answered, "Uh, like, I don't know. I'm just not used to this. I'm bein' honest." Adan then said, "So, I'm not sure if I should have a lawyer with me cuz I'm, I'm not even sure if it's gone that far. Am I under arrest?" Lane told him he was. Adan acknowledged this but continued, saying, "Okay. Um . . . I'm just, I'm—how, how [inaudible] it's honest, man. Um, I met these two ladies at work—where I work at, at the Rowan Hotel[,] Palm Springs, and showed them a good time, and everything was fine. They lost a pu- her purse, [inaudible] cuz she lost her purse, I guess."

As Adan talked, Lane responded with "Yeah," or "Okay," but did not ask any probing questions. Adan admitted to taking Doe's room key from her purse before returning it. Later, he came back to her room, where he "kinda laid down and started touchin' her like a dummy." At some point he "took off [his] pants."

Adan continued to describe what happened and Lane continued to say, "Okay." Lane then took Adan back through the statement he had made, asking follow-up questions to elicit greater detail about, for example: (1) what Adan and Doe talked about; (2) what kinds of drinks Doe was drinking, (3) where Doe lost her purse; (4) how Adan retrieved the purse; (5) what happened when Adan returned the purse to Doe's mom; and (6) what Adan did when he went into Doe's room. Adan admitted that he touched Doe's legs, breasts, and butt; he also acknowledged that he first inserted two fingers and then his penis into her vagina. But he also explained that earlier in the day Doe had given him her phone number and hotel room number, the two had kissed, and he had asked to visit Doe's hotel room.

About three-quarters of the way through the interview, Lane started to challenge Adan on some inconsistencies in his statements. Lane conceded

10

that he asked some pointed questions. He felt justified in doing so because he was "trying to satisfy the elements of the crimes [and] trying to make sure there's enough information where a jury could make an educated and informed decision as to whether or not a crime was committed." This jail interview lasted approximately 73 minutes.

## D.  *The Motion to Suppress*

Adan moved *in limine* to exclude both the hotel statement and the jail statement. The prosecution asserted there was no need for a *Miranda* warning during the questioning at the hotel because Adan was not in custody. After taking testimony from officers and reviewing a portion of the audio recording, the court found that Stepfather and the three officers detained Adan in the hotel room. The subsequent interview, though, did not occur like a typical interrogation; instead, as Adan provided information, the officer asked follow-up questions for clarification. It unfolded less like an interrogation and more like a defendant who wanted to give a statement. Adan was reasoning with the officers and was trying to "talk his way out of it," in the court's view. After Adan confessed that he stole Doe's room key, the court reasoned that the officers would not have let Adan leave and thus at that point the interview became custodial. As a result, although Adan's statements at the hotel were voluntary, the police should have advised Adan of his *Miranda* rights and the hotel statements were inadmissible.

Adan's subsequent post-*Miranda* statements at the jail, however, were a different matter. As with the statements at the hotel, the court specifically found that Adan's *Mirandized* statements at the jail were voluntary, a point the defense did not dispute. It then determined that the jail statements were admissible, rejecting Adan's reliance on *Seibert*, *supra*, 542 U.S. at 613–614,

11

and his assertion that the second interview at the jail was conducted for the purpose of evading the protections of *Miranda*.

At trial, the jury saw the video of Adan's jail interview. Adan was convicted on all counts.

## DISCUSSION

**A.** ***The Jail Interview Statements Were Properly Admitted Because Officers Did Not Deliberately Employ a Two-Step Interrogation to Undermine Adan's Miranda Rights***

1. *Standard of Review and Applicable Legal Principles*

Issues relating to the suppression of statements made during a custodial interrogation are evaluated under federal constitutional standards. (*People v. Flores* (2020) 9 Cal.5th 371, 416.) "When a reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation," and independently decide whether, given those circumstances, the statements were illegally obtained. (*People v. Potter* (2021) 66 Cal.App.5th 528, 540.) To the extent the interview is recorded, "the facts surrounding an admission or confession are undisputed" and subject to our independent review. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

" 'To safeguard a suspect's Fifth Amendment privilege against self-incrimination from "the inherently compelling pressures" of custodial interrogation,' " a custodial interrogation must be preceded by *Miranda* warnings and by the suspect's knowing and intelligent waiver of them. (*People v. Leon* (2020) 8 Cal.5th 831, 842–843.) Statements taken in violation of this rule are generally inadmissible. (*Stansbury v. California* (1994) 511 U.S. 318, 322.)

12

But "the mere fact that a defendant has made unwarned admissions does not render subsequent warned confessions inadmissible." (*People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*), citing *Elstad, supra*, 470 U.S. at p. 307.) In *Elstad*, the United States Supreme Court held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad*, at p. 314.)

In *Seibert*, the United States Supreme Court revisited *Elstad* and concluded the *Elstad* rule was inapplicable when an officer deliberately uses a two-step interrogation process to circumvent *Miranda*. (*Seibert, supra*, 542 U.S. at p. 604.) In *Seibert*, the officers intentionally did not *Mirandize* the suspect before questioning her for 30 to 40 minutes. (*Id.* at pp. 604–605). After a 20-minute break, the same officers, in the same location, gave the suspect *Miranda* warnings and then resumed their interview. (*Id.* at p. 605.) An officer testified this was a deliberate two-step interrogation technique: "[Q]uestion first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect] already provided once.' " (*Seibert*, at pp. 605–606.)

In concluding that Seibert's post-*Miranda* confession could not be admitted, a plurality of the court explained: "When warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " (*Seibert, supra*, 542 U.S. at pp. 613–614.) The court continued, "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations . . . simply

13

because *Miranda* warnings formally punctuate them in the middle." (*Id.* at p. 614.)

Justice Kennedy concurred, reasoning that if interrogators deliberately employ a two-step strategy, the trial court must suppress postwarning statements unless the interrogators take curative measures to ensure that a defendant understands his rights. If the two-step method is not deliberate, the postwarning statements are admissible if voluntarily made. (*Seibert, supra,* 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).)

Courts applying *Seibert* have had to consider whether to apply the *Seibert* plurality's approach or the narrower rule from Justice Kennedy's concurrence.[4] When recently faced with this question, the California Supreme Court declined to formally adopt one rule over the other and instead chose to apply both approaches, as the result in that case would be the same under either.[5] (*Krebs, supra,* 8 Cal.5th at p. 309.)

---

[4]    When " 'a fragmented [United States Supreme] Court decides a case,' " and no single view " 'enjoys the assent of five Justices,' " the holding of the case is the legal standard that, when applied, will "produce results with which a majority of the Court from that case would agree.' " (*United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157 [concluding that Justice Kennedy's concurrence represents the holding of *Seibert*].) Consistent with this principle, before *Krebs,* California courts generally followed the Kennedy concurrence. (See, e.g., *People v. Camino* (2010) 188 Cal.App.4th 1359, 1371; *People v. Rios* (2009) 179 Cal.App.4th 491, 505.)

[5]    Since *Krebs,* our colleagues in the Sixth Appellate District have assumed, without deciding, that Justice Kennedy's concurrence should control but the analysis should be "informed by" the factors set forth in the *Seibert* plurality. (*People v. Sumagang* (2021) 69 Cal.App.5th 712, 729 (*Sumagang*).)

2. *Analysis*

Under Justice Kennedy's approach in *Seibert*, we consider whether the officers deliberately withheld *Miranda* warnings during the hotel interview in a calculated attempt to undermine *Miranda*'s effectiveness. If they did so, we would have to determine whether sufficient curative measures were taken during the subsequent *Mirandized* interrogation at the jail. (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).)

Adan contends a reasonable officer should have known that Adan was in custody at the hotel, such that the allegedly "negligent" failure to give a *Miranda* warning there amounted to "intentionally withholding" the *Miranda* advisement as part of a deliberate two-step interrogation procedure. Adan further argues that Lane "used the first interrogation as a road map" and "elicited the exact same statements from appellant the second time around."

We agree with the trial court that the officers did not deliberately withhold *Miranda* warnings during the hotel interview to undermine *Miranda*'s effectiveness. Substantial evidence supports the trial court's findings that the interview was not a typical interrogation but was more like a defendant giving a statement. Adan was trying to talk his way out of trouble by reasoning with Kulbin, and he gave the statement voluntarily.

Kulbin testified he went into the hotel room "blind" as to what had happened. He did not know if the sexual encounter between Doe and Adan might have been consensual. Kulbin did not have probable cause to arrest at the outset of the interview, and he did not believe he needed to administer *Miranda* warnings because Adan's detention was for investigative purposes. The audio recording reflects that Kulbin asked open-ended questions, starting the interview by asking how Adan met the victim and requesting a

15

"running account" of events. As Adan provided information, Kulbin asked follow-up questions for clarification.

We conclude that with the limited information he had, Kulbin reasonably began the hotel interview believing it to be " 'a temporary detention for investigation.' " (See *People v. Farnam* (2002) 28 Cal.4th 107, 180 (*Farnam*).)[6] So rather than a deliberate attempt to thwart *Miranda*, Kulbin's decision not to give *Miranda* warnings to Adan in the hotel room was an understandable, if ultimately mistaken, approach. (Compare *Sumagang, supra*, 69 Cal.App.5th at p. 723 [detective testified that he knew he was supposed to administer *Miranda* warnings but " 'chose not to' " because he "wanted to see what [defendant] had to say first"].) Kulbin's failure to recognize the precise point at which Adan was "in custody" such that a warning was required does not demonstrate a deliberate attempt to undermine *Miranda*. (See *Krebs, supra*, 8 Cal.5th at p. 311; see also *id.* at p. 312 [ "simply because an officer could have given an advisement earlier is not enough to show that he delayed 'in a calculated way to undermine the *Miranda* warning' "].)

We note Adan was forthcoming with Kulbin and continued to be so in the later conversation with Lane—even "effusive[ly]" as the trial court recognized. That Adan had already effectively confessed and apologized to

---

6       "[T]he term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*Farnam, supra*, 28 Cal.4th at p. 180.) The law "recognizes the value of routine and nonintrusive police inquiry before arrests and accusations are made. Such inquiry serves to minimize mistakes and protect the innocent" (*People v. Morris* (1991) 53 Cal.3d 152, 198), and to " ' "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges." ' " (*People v. Leyba* (1981) 29 Cal.3d 591, 599.)

16

Stepfather before the hotel room interview with the police provides additional support for the trial court's conclusion that Adan's inculpatory statements to Kulbin were voluntary and not the result of coercive tactics by the officer in deliberate violation of *Miranda*'s protections.

As for the second objection, the trial court implicitly found there was no effort by officers to exploit Adan's unwarned statement at the hotel by using it as a "road map" to elicit a safe, *Miranda*-proof confession at the jail. Our review of the recording and transcript reveal that Lane's interview was open-ended, conversational in tone and largely nonconfrontational, and he never invoked Adan's prior statement to get him to confess in the subsequent interview. Adan was the first to mention he had already told a police officer what happened. When this came up, far from confronting Adan with his prior statements, Lane asked what Adan had said to the other officer, suggesting he did not know the details of the hotel interview. Unlike *Seibert*, where the "postwarning interview resembled a cross-examination," in which the officer "confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them," Lane made no affirmative references whatsoever to Adan's earlier statement. (*Seibert, supra*, 542 U.S. at p. 621.)

We therefore agree with the trial court's conclusion that officers did not deliberately employ a two-step interrogation procedure to subvert *Miranda*'s protections and exploit Adan's unwarned hotel room statement. Under Justice Kennedy's approach in *Seibert*, the absence of deliberateness means we need not determine whether curative measures were needed or taken.

Even if we follow the approach in *Sumagang*, *supra*, 69 Cal.App.5th at page 730 and consider how the *Seibert* plurality's analysis would inform our inquiry, we would reach the same conclusion. The *Seibert* plurality's test

17

asks whether recitation of *Miranda* warnings after an unwarned confession could effectively inform a suspect that he has a " 'real choice' whether to follow up on his earlier incriminating statements or 'stop talking.' " (*Krebs, supra*, 3 Cal.5th at 309, quoting *Seibert*, 542 U.S. at p. 612.) Envisioned as "an objective inquiry from the perspective of the suspect" (*Seibert, supra*, 542 U.S. at p. 621 (conc. opn. of Kennedy, J.) [describing plurality's test]), *Seibert* listed the factors relevant to this inquiry as "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert*, at p. 615.)

In Adan's view, it is "inconceivable" that he could have actually understood he had the right to remain silent in the second interview after "spilling his guts" during the first. To the contrary, however, even consideration of the *Seibert* plurality factors compels us to agree with the trial court that Adan's post-*Miranda* statements were admissible. We concur with Adan that the first factor—the completeness and detail in the first interrogation (*Seibert, supra*, 542 U.S. at p. 615)—tends to weigh *against* the effectiveness of the *Miranda* warnings. Kulbin's initial interview was relatively thorough, such that at the end there was probable cause to arrest Adan when none existed at the outset. Adan admitted to all of the crimes he would eventually be charged with, including stealing the key to enter Doe's hotel room, penetrating Doe with his fingers, and having sex with her.

The significant overlap in topics and admissions between Adan's first and second statements (*Seibert, supra*, 542 U.S. at p. 615), which would also generally weigh *against* the effectiveness of *Miranda*, does so only slightly

18

on the facts of this case. It is unsurprising that Lane's open-ended, chronological questioning elicited similar responses to Kulbin's open-ended, chronological questioning. It is not unexpected that someone narrating the events of his day—and confessing his crime a second time on the same day it occurred—would repeat many of the same things. Along with admissions, Adan supplied explanations, telling Lane that Doe had given Adan her phone number, the two had kissed, and Adan had asked Doe if he could visit her hotel room. The record amply supports the trial court's characterization of Adan's statements as attempts to "reason[] with the officers" and "talk his way out of it." We do not view the similarities in Adan's confessions as strongly supporting a conclusion that the *Miranda* warnings at the beginning of the second interview could not be effective.

The remaining factors—timing and setting, continuity of personnel, and continuity of questioning (*Seibert*, *supra*, 542 U.S. at p. 615)—weigh *in favor* of the effectiveness of the *Miranda* warnings. There was a clear separation in setting, time, and personnel between the first and second interviews. Adan had been moved from the hotel room to an interview room at the jail. At least two hours had passed, and a different officer conducted the second interview. Instead of three officers in the hotel room, there was just one detective in the jail interview room with Adan. Lane did not use the first interview as a "road map"; indeed, he did not reference the earlier interview. In contrast, the interrogation found to be a "mere continuation" of the earlier questioning in *Seibert* involved the same officers in the same location, who, after a brief 15-20 minute break, gave *Miranda* warnings and then referenced back to the confession the defendant had already given. (*Seibert*, at p. 616.)

19

The totality of these circumstances reflect that the second interview was not a "coordinated and continuing interrogation," merely "punctuate[d]" by *Miranda* warnings in the middle as a formality (*Seibert*, *supra*, 542 U.S. at p. 601). This alternate analysis confirms that the officers did not engage in a deliberate two-step interrogation to improperly obtain a confession from Adan in violation of his *Miranda* rights.[7]

Under either Justice Kennedy's concurrence in *Seibert* or its plurality opinion, we agree with the trial court there was no violation of *Miranda* or *Seibert* and that Adan's jail confession was properly admitted under *Elstad*.

**B.** ***As A Lesser Included Offense of Assault with Intent to Commit Rape, the Burglary Conviction (Count 2) Must Be Dismissed***

Adan contends that the trial court erred in denying his request to dismiss the burglary conviction as a lesser included offense of assault with intent to commit rape. The People agree.

When a defendant is found guilty of both a greater and a lesser included offense arising out of the same act or course of conduct, the conviction of the lesser offense must be reversed. (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) Under the statutory elements test, first degree burglary is a lesser included offense of assault with intent to commit rape during the commission of first degree burglary. (*People v. Dyser* (2012) 202

---

7    Our colleagues in *Sumagang* further analyzed whether the *Seibert* plurality's test *by itself* would have produced the same result they reached applying Justice Kennedy's concurrence as informed by the *Seibert* plurality, although they did so in the context of deciding that the *Miranda* warnings were *not* effective. (*Sumagang*, *supra*, 69 Cal.App.5th at p. 730.) As we have explained, our analysis of the *Seibert* plurality opinion, by itself or otherwise, leads us to conclude that *Miranda* warnings could be effective to inform Adan he had the right not to proceed with the interview at the jail, that Adan validly waived his rights, and that the resulting statement was voluntary.

Cal.App.4th 1015, 1020.) In such a scenario, "the generally understood rule is that appellate courts should 'reverse the conviction for the included offense and direct the entry of a dismissal of the less serious crime.' " (*People v. Meno* (2024) 102 Cal.App.5th 943, 949.)

We therefore conclude that Adan's conviction for first degree burglary in violation of section 459 (count 2) should be reversed because it is a lesser included offense of his conviction for assault with intent to commit rape during a first degree burglary, in violation of section 220, subdivision (b) (count 1). We shall direct entry of a dismissal on count 2.

## C. *Count 6 Was Improperly Designated as a Violent Felony*

Adan contends that the abstract of judgment for the determinate sentence incorrectly identifies his conviction for rape of an intoxicated person in count 6 as a violent felony. The People agree.

Section 667.5, subdivision (c) lists certain crimes that, the Legislature has declared, "merit special consideration" when imposing a sentence for new offenses "to display society's condemnation for these extraordinary crimes of violence against the person." (§ 667.5, subd. (c).) That list of violent felonies includes "rape" as defined in section 261, subdivisions (a)(2) or (a)(6). Adan was not found guilty of either of those offenses. Rather, he was convicted in count 6 of rape of an intoxicated person in violation of section 261, subdivision (a)(3), which does not appear on the list of violent felonies.

21

We therefore agree with the parties that rape of an intoxicated person is not a violent felony within the meaning of section 667.5, and the abstract of judgment should not reflect such a designation in connection with count 6.[8]

## DISPOSITION

We reverse Adan's conviction on count 2.  We remand the matter to the trial court with directions to dismiss count 2 and to remove the "violent felony" designation on count 6.  The trial court is instructed to prepare an amended abstract of judgment that reflects his custody credits under section 4019 instead of section 2933.1 and to forward a certified copy to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

DATO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.

---

[8]     Due to the mistaken designation, Adan's precustodial credits were wrongly calculated under section 2933.1 instead of section 4019.  (§ 2933.1 subd. (a) [limiting credits for persons convicted of a felony offense listed in § 667.5, subd. (c)]; § 4019 [credits for other prisoners].)

22